Brad Howard

ORIGINAL

1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION


JONATHAN NIELSEN                  NUMBER: 3:09-cv-01757

VERSUS                            JUDGE JAMES

GRAPHIC PACKAGING                 MAGISTRATE JUDGE HORNSBY
INTERNATIONAL


Deposition
of
BRAD HOWARD


Taken on April 12, 2011, at Law Offices of Crawford & Ogg,
1904 Royal Avenue, Monroe, Louisiana, commencing at 1:00 p.m.

RECEIVED

APR 2 1 2011

MAYER, SMITH & ROBERTS LLP


REPORTED BY:   Betty P. Toms, CCR #88032


EXHIBIT
A

Betty Toms Court Reporting
866-395-8545      PO Box 1150 - West Monroe, LA 71294      btoms@bellsouth.net

APPEARANCES:

FOR THE PLAINTIFF,
JONATHAN NIELSEN:

Mr. Brian E. Crawford
Crawford & Ogg
P.O. Box 14600
Monroe, LA 71207-4600
(318) 325-3200

AND

Mr. Myrt T. Hales, Jr.
Attorney at Law
P.O. Drawer 149
Rayville, LA 71269-0149
(318) 728-4413


FOR THE DEFENDANTS, GRAPHIC
PACKAGING INTERNATIONAL:

Mr. Caldwell Roberts, Jr.
Mayer, Smith & Roberts, LLP
1550 Creswell
Shreveport, LA 71101
(318) 222-6420

Noticed But Not Present:

FOR INTERVENOR, LOUISIANA
WORKERS' COMPENSATION CORPORATION:

Mr. Musa Rahman
Johnson, Stiltner & Rahman
2237 S. Acadian Thruway
P.O. Box 98001
Baton Rouge, LA 70898-8001

## STIPULATIONS

Deposition of BRAD HOWARD taken by counsel for
Defendants, Graphic Packaging International, to be used for
all purposes allowed by Federal Rules of Civil Procedure.

The witness has waived reading and signing of the
deposition.

4

EXAMINATION INDEX

Examination – Mr. Roberts                5
Examination – Mr. Crawford              57
Examination – Mr. Roberts               61


INDEX OF EXHIBITS

Howard 1                                 42
    Supervisor's Investigation Report (1 page)

Howard 2                                 42
    Clayton Personnel Services – Personnel
    Authorization Form, effective date
    2-25-08 (1 page)

Howard 3                                 42
    Clayton Personnel Services – Personnel
    Authorization Form, effective date
    6-17-05 (1 page)

Howard 4                                 44
    Clayton Personnel Services – Application
    for Employment dated 10-28-03 (2 pages)

Howard 5                                 61
    Affidavit by Brad Howard (2 pages)

5

1    BRAD HOWARD, being duly sworn, testified as follows:

2                              EXAMINATION

3    BY MR. ROBERTS:

4    Q    Mr. Howard, we met a couple years ago, I believe. My

5    name is Colly Roberts. I'm representing Graphic Packaging in

6    a lawsuit that has been filed by Mr. Nielsen, and I've issued

7    a subpoena for you to come here today and give your

8    deposition. I know you've given your deposition one time in

9    the past. Is this your second occasion?

10   A    Yeah, second occasion.

11   Q    If you don't understand one of my questions, please ask

12   me to repeat it. Otherwise I'll assume you understood my

13   question and your answer was responsive. If you need to take

14   a break, just let me know. We'll be happy to do that. Let

15   me get your name and address, please, sir.

16   A    My name is Brad Howard. My home address is 2433 Highway

17   151 North. That's in Downsville, Louisiana, and the ZIP is

18   71234.

19   Q    And who is your current employer?

20   A    Konecranes, Inc.

21   Q    And what is your position with Konecranes, Inc.?

22   A    I'm the branch manager in Monroe, Louisiana.

23   Q    Now, I understood that Konecranes, Inc. used to be Crane

24   Pro Services. Were you working for that entity at any time?

25   A    Yes. When I started it was -- the service entity was

1  known as Crane Pro Services.

2  Q    When did you start working for Crane Pro Services?

3  A    It was May the 1st, I believe, of 2006.

4  Q    And did you start out as the branch manager?

5  A    I started out as a service manager; you know, pretty

6  much the same responsibilities, just a different title.

7  Q    When did that title change?

8  A    It was -- I don't know the exact date. It changed last

9  year.

10 Q    Now you're the branch manager?

11 A    Right.

12 Q    When you first started working for Crane Pro Services,

13 which later became Konecranes, Inc., what was your initial

14 job duty type role? What did you do when you started out

15 there?

16 A    Well, basically I was the manager of the service

17 operation, so I was the manager of the branch, really. You

18 know, overseeing, you know, supervisors and technicians, also

19 our sales and administrative side of the branch. So, just

20 more or less like running the business.

21 Q    Where did you work before going to Crane Pro/Konecranes?

22 A    I was an employee of ABB. It's a maintenance contractor

23 for International Paper.

24 Q    And how long had you been employed by ABB?

25 A    ABB was only a few months. I was an employee of

1   International Paper.  International Paper had contract

2   maintenance in their mill.  The contractor when I hired in

3   was Kellogg, Brown and Root.  Kellogg, Brown and Root's

4   contract came up.  They didn't renew.  They brought in ABB.

5   One of the terms of ABB coming in was that all of the

6   maintenance supervision be outsourced to their company.  So

7   basically I became an ABB employee at that time.

8   Q     So you had experience working on cranes?

9   A     No.  I mean even in that capacity I was supervision,

10  maintenance supervision.  I mean I did have a little bit of

11  crane experience, just knowing what the parts and pieces were

12  and the functions were but, you know, as far as actual

13  hands-on technical experience, no.

14  Q     What is your educational background?

15  A     I'm an electrical engineer.

16  Q     And where did you get your electrical engineering

17  degree?

18  A     Louisiana Tech.

19  Q     And when was that?

20  A     Graduated in May of '04.

21  Q     And is that when you went to work at International

22  Paper?

23  A     Yeah.  I went to work for IP in August of '04.

24  Q     And you worked there, had a few months with ABB and then

25  you came to work for -- I guess it was Crane Pro Services?

Brad Howard

8

1    A    Yes.

2    Q    And they later changed their name to Konecranes, Inc.?

3    A    Yes.

4    Q    Do you know if Crane Pro Services was bought by

5    Konecranes, Inc., or how did that happen?

6    A    Well, my understanding was, you know, Crane Pro Services

7    was the service subsidiary, if you will, of Konecranes.

8    Konecranes always existed.

9    Q    I see.

10    A    Basically it was just a rebranding type thing. Uh-huh.

11    Q    So how big a company is Konecranes, Inc.? You've got

12    offices all over the country or --

13    A    All over the world.

14    Q    All over the world?

15    A    Uh-huh.

16    Q    So we're talking thousands of employees?

17    A    Yeah. Like 10,000, I think.

18    Q    How many offices does Konecranes have in Louisiana?

19    A    Two.

20    Q    And where are they?

21    A    Monroe and LaPlace.

22    Q    Now, I understand Mr. Nielsen was employed by Clayton

23    Administrative Services, Inc.?

24    A    Uh-huh.

25    Q    Is that your understanding?

# Brad Howard

9

1    A    Yes.

2    Q    When you came to work for Konecranes was -- and I guess

3    this was, what, about -- you said about May of '06?

4    A    May of '06.

5    Q    Did you know who John Nielsen was at the time you came?

6    Was he around for you to meet at that time, or did you

7    start --

8    A    Yes.  Yeah.

9    Q    So he had been doing work at Konecranes' request for

10   some period of time before you came to work there?

11   A    That's correct.

12   Q    So did you have any role in hiring Mr. Nielsen for any

13   purpose?

14   A    No.

15   Q    Do you know how Mr. Nielsen came to be doing work for

16   Konecranes?

17   A    No, I don't.

18   Q    Do you know who Gina Nielsen is?

19   A    Yes.

20   Q    And do you know that she is his sister-in-law?

21   A    Yes.

22   Q    And Gina Nielsen is employed at Konecranes, Inc.?

23   A    Yes.

24   Q    Was she there when you came?

25   A    Uh-huh.  Yes.

Brad Howard

10

1    Q    So you don't know any of the facts about how he came to
2    do work there at Konecranes, Inc.?

3    A    No.

4    Q    When you came to work at Konecranes, Inc. in May of '06,
5    how many service technicians did Konecranes have doing its
6    maintenance for various companies?

7         MR. CRAWFORD:  At this particular branch?

8         MR. ROBERTS:  Yeah, at the Monroe branch, working
9    out of the Monroe branch.

10   A    It was either nine or ten.  Either nine or ten.  I can't
11   remember which it was, but it was either nine or ten.  It may
12   have been ten.

13   Q    And these guys that were doing this work, were they all
14   employed by Clayton Administrative Services, Inc., or would
15   some be employed by Clayton and some be employed by
16   Konecranes directly?

17   A    Now, the nine or ten people that we had were all full
18   employees of Konecranes.  Uh-huh.

19   Q    And so did you have additional folks that could do crane
20   service work at the direction of Konecranes that were not
21   Konecranes employees?

22   A    Yes.

23   Q    And you would consider Mr. Nielsen to be one of those
24   individuals?

25   A    Yes.

Brad Howard

11

1   Q     How many individuals did you have that could do work on

2   cranes at Konecranes' direction that were not direct

3   employees of Konecranes when you came in there in May of '06?

4   A     At that time it was -- at that time I believe it was

5   three people, Mr. Nielsen being one of those.

6   Q     Do you know who the other two were?

7   A     Not offhand.  I can think of first names but I don't

8   know their full names offhand.  I'm sorry, Colly.

9   Q     So there were about nine or ten direct Konecranes

10  employees and then there were about three guys that were not

11  direct employees but were employed by Clayton Administrative

12  Services, Inc.?

13  A     Correct.

14  Q     Do you know what the reason was that there were nine or

15  ten that were direct employees and there were three that were

16  not?

17  A     The primary reason was basically workload.  If we

18  didn't -- you know, if we didn't have quite the workload to

19  have, you know, someone like Mr. Nielsen as a full-time

20  40-hour-a-week-plus employee, then we would have an

21  arrangement like that where if we did have a big job going

22  on, or we had, you know -- if we had a busy week or

23  something, we could bring somebody like that in for extra

24  support.  But as far as, you know, a sustainable workload,

25  you know, if we did have that, we would actually hire

Brad Howard

12

1   employees, but through Konecranes. But basically we used

2   that as kind of like an overflow type thing, you know.

3   Q    And the folks that were doing maintenance work on cranes

4   that were directly employed by Konecranes, Inc., did they

5   work on a salary, or did they get an hourly rate, or how was

6   their pay determined?

7   A    It was an hourly rate.

8   Q    And I understand from speaking with Mr. Nielsen and

9   Clayton that Mr. Nielsen also had an hourly rate. Is that

10  correct?

11  A    Yes.

12  Q    Do you know who would set Mr. Nielsen's hourly rate?

13  A    It would be set by me.

14  Q    And did you pay folks different because they were

15  employed by Clayton as opposed to direct employees of

16  Konecranes?

17          MR. CRAWFORD: In terms of the hourly rate?

18          MR. ROBERTS: In terms of the hourly rate.

19  A    Basically what you're asking is a different rate for a

20  full-time Konecranes employee versus an employee through

21  Clayton? Is that what you're asking?

22  Q    Yeah, an hourly rate. Was that different depending on

23  who they were directly employed by?

24  A    Yeah. There would be -- well, the hourly rate that we

25  pay is based on your skill level, your experience level. You

1   know, if an employee that was hired through Clayton Services

2   has a -- you know, if he had a really high skill level then,

3   you know, his pay would probably be the same or, you know, as

4   much as the rest of my employees. So, you know, no -- just

5   that raw distinction, no.

6   Q     Well, I mean would someone that had the same skill level

7   and experience level that worked directly for Clayton,

8   with -- let me rephrase that.

9       If there was an individual who had the same skill level

10  and experience level as another individual -- let me start

11  over.

12      Say there were two people, okay?

13  A     Okay.

14  Q     One is employed by Konecranes, Inc. directly, one is

15  employed by Clayton Administrative Services directly, but

16  they both have the same skill level and experience level.

17  Are they going to make the same wage?

18  A     Their pay would be very comparable, yes.

19  Q     So you use Clayton Administrative, Inc. -- well, you've

20  explained because of workload you don't always have -- you're

21  not busy enough to keep a full-time staff of 13 or 20, I

22  guess, and so you could use folks as needed that were

23  employed by Clayton. Is that a good summary of why you would

24  distinguish and not hire these people directly and use

25  Clayton instead?

14

1    A    Well, you know, some of these individuals had other jobs

2    even that had nothing to do with Clayton.  You know,

3    basically if I was in a position where I had to work -- you

4    know, I had guys working on a weekend, you know, and I needed

5    additional support, I could call on someone like Mr. Nielsen,

6    you know, and they could come in and work that weekend and

7    they would be paid by Clayton Administrative Services.

8    Q    The folks that are directly employed by Konecranes,

9    Inc., are they precluded from working for other companies, on

10   other jobs?

11   A    To my knowledge, yes.

12   Q    Is that because of trade secrets and -- I mean you can

13   tell a guy that's working 40 hours a week for you, Look,

14   you're not allowed to work at Winn-Dixie on the weekends or

15   something?

16   A    Well, our company has a policy against moonlighting, and

17   we also have a policy against -- we have a no-competition

18   agreement that our employees sign.

19   Q    But you do have a -- even if it's in a different field,

20   you have a policy against moonlighting?

21   A    Yes.

22   Q    Would that moonlighting policy apply to someone like Mr.

23   Nielsen?

24   A    No.

25   Q    Because he's not a direct employee of Konecranes?

Brad Howard

15

1    A    That's correct.

2    Q    What other differences are there in the treatment --

3    well, that's a broad word.  Let's talk about the differences.

4    Did you have any uniforms that employees at Konecranes would

5    wear versus uniforms that Clayton folks would not wear?

6    A    Our full-time employees all have uniforms, yes.  You

7    know, in Mr. Nielsen's specific case, you know, he did a lot

8    of -- you know, he was on a lot of jobs for Konecranes.

9    Basically Mr. Nielsen, I believe, you know, some years ago

10   was provided with uniforms just like the rest of our

11   employees.  But in a typical case of a guy that comes in and

12   works for us and is paid by Clayton, he is not provided

13   uniforms, no.

14   Q    Was Mr. Nielsen somebody that did a lot more work than

15   most folks that are directly employed by Clayton?

16   A    Yeah.  We used Mr. Nielsen fairly consistently, yes.

17   Q    And so you provided him with a uniform?

18   A    Yes.

19   Q    And I see you've got a shirt on that says Konecranes.

20   Is that the uniform?

21   A    No, no.  No.  No, our guys' uniforms are -- you know,

22   they are FRP, fire resistant.  You know, it's a button-down,

23   long-sleeved shirt and cotton pants.  So, yeah.

24   Q    Who made the decision about whether or not you wanted

25   Mr. Nielsen to do a particular job on any given day?  Who

Brad Howard

16

1   would make that call?

2   A    It could very easily be myself.  Also our service

3   supervisors could make that call if they -- you know, they

4   more or less oversee the day-to-day.  If they see we have a

5   need and, you know, if the job needs three men and we only

6   have two, you know, guys that we can send out there, then

7   they might make that decision.

8   Q    Would someone at Konecranes have the right to fire Mr.

9   Nielsen if they elected to do so?

10       MR. CRAWFORD:  Object to the form of the question.

11  I don't know how you can fire somebody that's not your

12  employee.

13       Go ahead subject to my objection.

14  A    Basically we could -- I suppose we could.  I mean we

15  could tell -- we could basically tell Mr. Nielsen we have no

16  work for him, but it wouldn't be a -- you know, it wouldn't

17  be a quote/unquote termination as far as -- you know, there

18  would be no paperwork on my end I'd have to fill out.

19  Q    Right.  But you could say "I don't like the way you're

20  doing things, don't come back"?

21  A    Right.  That's right.

22  Q    What role did Clayton Administrative Services have in

23  the particular day-to-day jobs that Mr. Nielsen would do for

24  Konecranes?

25  A    The only role that Clayton Administrative had was, you

Brad Howard

17

1    know, the daily timesheets and things like that would be

2    approved by us and sent to them so that he could be paid, you

3    know, on a biweekly basis or weekly basis, however they pay

4    their people.

5    Q    They wouldn't tell him how to safely change out a

6    mechanical load brake for instance?

7    A    No.

8    Q    These timesheets, where did these timesheets -- who

9    generated the forms for these timesheets?

10    A    The guys are filling out our timesheets, and it's --

11    Q    The Clayton guys are filling out Konecranes timesheets?

12    A    Yes.

13    Q    And what about your direct employees?  Do they have to

14    fill out timesheets, too?

15    A    Yes.

16    Q    And they are the same form?

17    A    Yes.

18    Q    And what -- does it just record the hours they worked

19    and where they worked?

20    A    Exactly.  It's just, you know, time in and out, which

21    job they were on, you know, and it's kind of like a

22    spreadsheet type thing where they've got several lines there

23    to track multiple jobs.

24    Q    And the Konecranes employees that fill the timesheets

25    out, what would they do with their timesheets at the end of

Brad Howard

18

1  the day?

2  A    They bring them into our office and turn them in to

3  their supervisor.

4  Q    What would Mr. Nielsen do with his timesheet?

5  A    The same thing.

6  Q    And what would your office do -- I mean would you

7  separate out Mr. Nielsen's timesheet from your direct

8  employees, or how would y'all work that?

9  A    Yes.  You know, we would go through, review all the

10  timesheets and approve them, and then we would take the

11  timesheets that would go to Clayton for the Clayton employees

12  and we would fax those over to them, once they -- once we

13  approved them.

14  Q    And do you know what Clayton would do with those

15  timesheets?

16  A    No, I don't.  I mean my understanding is, they take the

17  time and they pay their guys.

18  Q    Well, how did they know what hourly rate to pay Mr.

19  Nielsen?

20  A    At the time that the employee is set up, if you will,

21  to -- you know, like if the guy comes in, he fills out all

22  his initial paperwork to be set up with Clayton, the hourly

23  rate is set in that package paperwork.

24  Q    And that's an hourly rate that you set?

25  A    Yes.

Brad Howard

19

1   Q    And so Clayton doesn't have any say-so about what their

2   guy is going to work for by the hour; you and the worker

3   agree on that hourly rate?

4   A    That's right.

5   Q    And then so you, I guess, assume that that's the hourly

6   rate that Clayton would then pay Mr. Nielsen?

7   A    Yes.

8   Q    Based on the time that you have approved for the work

9   that you have provided for him to do?

10  A    Yes.

11  Q    So obviously you didn't get a free laborer that day.

12  Did you get a bill back from Clayton?

13  A    Yes.  Clayton -- you know, once all this process,

14  Clayton pays the guys and all that, they send us a bill for

15  that hourly rate plus 25 percent.

16  Q    And has that been the arrangement ever since you became

17  the branch manager or service manager at the Monroe facility

18  for Konecranes?

19  A    Yes.  Yes, it has.

20  Q    It's always been a 25-percent markup?

21  A    Yes.

22  Q    Do you know who negotiated that deal?

23  A    No.  I have no idea.

24  Q    Mr. Nielsen told us he came to work in about 2004,

25  started doing work for Konecranes in about 2004.  Does that

1   sound about right to you, or do you know?

2   A     Yes.

3   Q     How would you know that if it was before your time?

4   A     Basically the paperwork that Mr. Nielsen fills out to go

5   to be put on Clayton Administrative Services, sometimes we

6   would retain a copy of those papers, and it's in there.

7   Uh-huh.

8   Q     Did you ever have any communication or telephone

9   conversations or personal conversations with any folks at

10  Clayton Administrative Services about Mr. Nielsen?

11        MR. CRAWFORD:  Before or after the accident, or can

12  you give the time frame?

13  Q     Well, let's talk about before the accident.

14  A     Before the accident, no, I don't believe so.

15  Q     There wouldn't be any need -- all right, before the

16  accident, not about Mr. Nielsen, but did you ever have any

17  contact or communication with Clayton Administrative Services

18  about anybody or about anything before this accident?

19  A     The only time we would ever hear from Clayton is if they

20  had a question about a time ticket or, you know, something

21  didn't come across on the fax, you know.  That's really the

22  only time we would ever hear from them.  And a lot of times I

23  wouldn't deal with them directly.  My service supervisors,

24  you know, would answer their question or whatever.  But, you

25  know, the only time they would ever contact us is if they had

1    a question regarding time or something of that nature.

2    Q    Do you know when the relationship between Konecranes and

3    Clayton first commenced?

4    A    No.

5    Q    Who at Konecranes, Inc. would know about that?

6    A    Honestly, I don't know.  I really don't know.  I mean it

7    could be any number of people, you know, that's been with our

8    company for a long time.  I really don't know which certain

9    one.

10   Q    Do you know about when the relationship first commenced?

11   A    No.

12   Q    I take it -- you are the guy in the Monroe office.  Is

13   there a district manager, regional manager, something like

14   that pyramid set up at Konecranes?

15   A    Yes.  Yes, it is.

16   Q    Who is your immediate supervisor?

17   A    My immediate supervisor is Jim Eason, and his office is

18   in Daphne, Alabama.

19   Q    And what is his title?

20   A    He's the district manager.

21   Q    So for all you know -- well, there's always been

22   25-percent markup ever since you've been there in 2006?

23   A    Uh-huh.

24   Q    That's a "yes"?

25   A    Yes.

1    Q    Get the record straight.

2        Are you aware of any changes in that pricing scheme?

3    A    None that I'm aware of.  The only time anything would

4    change is if, you know -- excuse me.  The only time anything

5    would change is if the hourly pay for an employee would

6    change or something like that.

7    Q    I take it you hire people to come to work in the Monroe

8    office?

9    A    Yes.

10    Q    Is it your decision on whether or not to make those

11    persons Konecranes, Inc. employees or run their pay through

12    Clayton Administrative Services, Inc.?

13    A    No, not specifically my decision.  You know, it's

14    something that I would have to talk with our district manager

15    about and possibly even our district administrator, but it's

16    not solely my decision, no.

17    Q    So when you decide, hey, this is a great worker out

18    here, I'd love to have him, he's reliable, he knows what he's

19    doing, I'd love to have him working under me --

20    A    Uh-huh.

21    Q    -- and you've got the need to -- you've got lots of

22    business, and you want to put him to work, and you decide you

23    want to hire this guy, what do you do?  How do you get that

24    worked out?

25    A    Well, basically if it's -- you know, if it's someone

Brad Howard

1  that I want to go ahead and hire, you know, I'll call our

2  district manager or our district administrator, talk with

3  them, you know, basically talk about the guy, how he is

4  qualified, how his interview process went, you know, how he

5  did on his electrical test, you know, things like that. And

6  then at that point, you know, together we would collectively

7  make a decision, you know, yes, this is someone we want to

8  proceed with hiring. And then we would make the decision

9  then if we want to bring this guy -- you know, bring this guy

10 in as a Konecranes payrolled employee, or if we want --

11 sometimes we would choose to have this guy payrolled through

12 Clayton Administrative for the first 90 days, just because of

13 probationary period and things like that.

14 Q    And why would you want this person to be a Konecranes

15 employee as opposed to being a Clayton employee? If you

16 really wanted the guy, you thought he was a great guy,

17 whatever, why would you -- I understand about probationary

18 periods. But is there a factor in your mind that it's

19 beneficial to have this guy as a Konecranes employee and it's

20 not beneficial to have him as a Clayton or vice versa? Are

21 there any factors you weigh?

22 A    Well, I really don't know. I mean it's -- a lot of the

23 decision on that is made -- you know, I more or less find the

24 people, do the interview, you know, talk with the guy about

25 how much he wants to make per hour. You know, we negotiate

1   all that.  Whenever I call our district manager or our

2   district administrator and talk with them, they more or less

3   make a decision on whether -- you know, we decide

4   collectively if we're going to hire the guy.  Then they more

5   or less make a decision between themselves whether or not

6   we're going to bring this guy onto Konecranes' payroll from

7   day one, or if we're going to bring this guy in for, you

8   know, Clayton Administrative payroll for the first three

9   months or the first 30 days or whatever.

10  Q   "They" being your bosses make that decision?

11  A   That's right.  And I'm not sure what factors they

12  consider.  It may be internal cost per hour.  I'm not sure.

13  Q   And I guess you don't really care how he is classified;

14  all you want is a guy that shows up on time?

15  A   Right.  Yeah.  As long as I get the employee, that's

16  fine with me.

17  Q   And other than the fact that payroll is handled through

18  Clayton for those folks that are employed directly by

19  Clayton, are there any other differences in your treatment of

20  the workers that work on cranes?

21  A   No.

22  Q   They are supervised in the same way?

23  A   Yes.

24  Q   They are monitored in the same way and told what to do,

25  what not to do in the same way?

Brad Howard

25

1    A    Yes.

2    Q    Do you ever go through any type of performance

3    evaluations or annual reviews of these folks that work on

4    cranes for you?  Do you ever sit down and say, "All right,

5    let's have a meeting and we'll say what you're doing right,

6    what you're doing wrong"?

7    A    Yes.

8         MR. CRAWFORD:  The question about -- is that a

9    distinction between the payrollers and the direct employees,

10   or all of them?

11        MR. ROBERTS:  All of them.  All of them.

12   A    I do go through annual review processes with all of

13   my -- all of the Konecranes payrolled employees.  There's

14   not -- you know, as a standard practice, a consistent

15   practice, there's not really a consistent review practice

16   with the Clayton employees.  But, you know, if I have a

17   Clayton employee, you know, like Mr. Nielsen, for instance,

18   who is, you know, consistently doing -- providing, you know,

19   good work and doing a good job, you know, I would bring him

20   in and sit down and say, "Hey, listen, we appreciate, you

21   know, how good you're doing," and maybe identify some ways he

22   could improve, you know, kind of like an informal type of

23   review.  You know, and at that point we may discuss a pay

24   increase or something like that.  But there's no consistent

25   standard practice like it is with my employees.

Brad Howard

26

1    Q     Is there paperwork that you have to fill out for your
2    Konecranes employees on the review process that you do not
3    fill out for Clayton employees?
4    A     Yes.
5    Q     So that's another distinction?
6    A     Right.
7    Q     But what you're telling me, as a practical matter you
8    treat them the same and tell them what they're doing right
9    and what they're doing wrong, even if they're Clayton
10   employees?
11   A     That's right.
12   Q     Did you ever have any discussions with Mr. Nielsen
13   before this accident about him becoming a direct employee of
14   Konecranes, Inc.?
15   A     Yeah, Mr. Nielsen and I have discussed, you know,
16   whether or not he would be coming on as a full-time
17   Konecranes payrolled employee.  We've talked about it a time
18   or two, yes.
19   Q     Are there any advantages to Mr. Nielsen becoming a
20   direct employee of Konecranes insofar as benefits, vacations,
21   anything like that?
22          MR. CRAWFORD:  Advantages to Mr. Nielsen?
23          MR. ROBERTS:  To Mr. Nielsen.
24   A     Yes, there are advantages to Mr. Nielsen of becoming a
25   full-time Konecranes employee.

1   Q    And what are those advantages?

2   A    It is the benefits:  the health insurance, the 401(k),

3   you know, things like that.

4   Q    Do you know whether or not Clayton provided any benefits

5   such as 401(k)s, health insurance or anything of that nature?

6   A    I don't know.

7   Q    But I guess to a third party like Graphic Packaging, for

8   instance, would there be any way for Graphic Packaging to

9   know that Mr. Nielsen was employed by Clayton Administrative

10  Services instead of being a direct employee of Konecranes?

11       MR. CRAWFORD:  Object to the form of the question

12  as beyond the scope of the witness's knowledge.

13  Q    To your knowledge --

14       MR. CRAWFORD:  Go ahead, subject to my objection.

15  Q    To your knowledge, would there be any information that

16  could have been conveyed to or acquired by Graphic Packaging

17  to let Graphic Packaging know that Mr. Nielsen was an

18  employee of Clayton and not an employee of Konecranes?

19       MR. CRAWFORD:  Same objection.  Go ahead.

20  A    Well, I'm not sure I understand, Colly.  Are you saying

21  if Graphic -- if they ask me or --

22  Q    No.  I mean just looking out, seeing the guys come and

23  go.

24  A    Yeah.  If they just walked up on the floor and saw us

25  there working, you know, no, they would have -- you know,

1  they would have no idea.

2  Q   I've received a document, an affidavit that you've

3  signed, and it has been filed in this suit, Document 61-1,

4  and your attorney -- Mr. Crawford has handed you a copy of

5  that document.  You have it in front of you.  Do you

6  recognize that document?

7  A   Yes.

8  Q   And do you know who typed this document?

9  A   I believe Mr. Crawford's office typed this.  Yes.

10  Q   Did you come over here to execute this document at the

11  law office we're at today?

12  A   No.  One of Mr. Crawford's employees came to my office

13  and we executed it there.

14  Q   Were there drafts of this document exchanged before you

15  signed it, or any changes to it or anything of that nature?

16  A   There was an initial draft that there was one mistake in

17  there, just a miswording.  I think it had in there that I was

18  also an employee of Clayton.  So that was it.  That was fixed

19  and --

20  Q   Did you have any of your supervisors review this

21  document before you signed it?

22  A   No.

23  Q   Well, it says here that you are employed by Konecranes,

24  Incorporated in the capacity of branch manager.  And that's

25  correct; right?

Brad Howard

29

1   A    Yes.

2   Q    It says that you've been informed that the defendant

3   Graphic Packaging, Inc. has claimed that Clayton

4   Administrative Services, the employer of Jonathan Nielsen,

5   was a subcontractor in connection with work performed by

6   Konecranes at Graphics Packaging, Inc's. place of business in

7   Ouachita Parish, Louisiana, on September 23rd, '08.  Who

8   informed you of that?

9   A    Mr. Crawford.

10  Q    And you state that Konecranes did not enter into any

11  agreement with Clayton Administrative Services whereby

12  Clayton Administrative Services performed any part of the

13  work which may have been contracted between Konecranes and

14  Graphic on the date of Mr. Nielsen's accident of September

15  23rd, 2008.  And that's a correct statement; right?

16  A    Yes.

17  Q    Would it also be a correct statement that Konecranes

18  entered into an agreement with Mr. Nielsen whereby Mr.

19  Nielsen performed some part of the work which may have been

20  contracted between Konecranes and Graphic on the date of Mr.

21  Nielsen's accident?

22       MR. CRAWFORD:  Object to the form of the question.

23       Go ahead.

24  A    I'm not sure I understand.  You know, basically, you

25  know, Mr. Nielsen was given instruction on what we were

1   trying to do that day at Graphic, and he was out there as

2   part of a work crew.  But as far as an agreement, you know,

3   I --

4   Q   Well, I guess you and Mr. Nielsen had an agreement to

5   pay Mr. Nielsen an hourly rate to do some work; right?

6   A   Yes.  Yes, that's correct.

7   Q   And Konecranes had an agreement with Graphic to do some

8   work for Graphic; right?

9   A   That's right.  Uh-huh.

10  Q   And Mr. Nielsen performed some of that work on the date

11  of this accident, didn't he?

12  A   Yes.

13          MR. CRAWFORD:  Object to the form of the question

14  if it in any way implies that Mr. Nielsen was somehow a

15  subcontractor himself.  Facts simply do not merit that

16  conclusion.

17          Go ahead subject to my objection.

18  Q   So while there was no contract with Clayton to do the

19  work that Mr. Nielsen was doing on the date of the accident,

20  Mr. Nielsen was doing work that Konecranes had agreed with

21  Graphic to have done; right?

22  A   That's correct.

23  Q   In your next paragraph here you're talking about an

24  employment labor pool provider or a temporary labor provider.

25  What is an employment labor pool provider?

1    A    What I would consider an employment labor pool provider

2    is a company that, you know, a company like my own might

3    partner with where you call them and say, you know, "Hey,

4    I've got this big job. I need, you know, four or five

5    people, you know, on X day to be here." And basically they

6    go find and -- you know, you tell them kind of what skill

7    sets, if you're looking for mechanics or electricians or --

8    you know, they basically provide you with those people.

9    Q    Well, what's the difference in that situation that you

10   just described and the situation with Mr. Nielsen doing work

11   for Konecranes?

12   A    Well, basically in the case of Mr. Nielsen, or an

13   employee like Mr. Nielsen, you know, we would actually go and

14   find the employee, or the employee may come into our office

15   and tell us what he is capable of, what his past experiences,

16   skill sets are. And at that point we would, you know, kind

17   of recruit the guy, I guess, in a sense.

18       It wouldn't -- you know, the difference there is when we

19   call a labor pool company and we tell them what we need. You

20   know, we're not soliciting individual people, we're just

21   telling them what skills we need and how many people and

22   they're doing all the recruiting and the hiring. There's no

23   agreements for hourly wage and things like that, they just

24   send the guys out.

25       Now, we may have an agreement with that company on an

Brad Howard

32

1   hourly -- a rate that we're going to pay them, but on the

2   individual basis, there's no agreements there.  But in the

3   case of like, you know, Clayton, you know, we would actually

4   already have the employee recruited, the hourly wage,

5   everything would be negotiated, and then basically his

6   payroll would be routed through Clayton.

7   Q    From time to time does Konecranes call up folks that you

8   consider to be employment labor pool providers to get

9   workers?

10  A    At times.  It's mostly -- you know, in my experience, in

11  my branch, it's been mostly clerical or administrative type.

12  You know, we would call a company like, you know, WillStaff

13  or Manpower and tell them what we're looking for and they

14  would send over candidates, and we would interview and -- you

15  know, basically if we decided we were going to hire one of

16  those candidates, we wouldn't actually be hiring them, we

17  would be bringing them in and we would have an agreed set

18  thing, rate of pay, with WillStaff or whoever the company is,

19  and it would be like a temp-to-hire type thing.  We would

20  have this employee on a temp basis and then move into a

21  full-time position.

22  Q    So basically the distinction you make between an

23  employment labor pool provider and Clayton Administrative

24  Services is that with respect to the workers that are

25  employed by Clayton Administrative Services, you've actually

Brad Howard

33

1  gone out and selected those people, recruited those people,

2  found those people, as if they were going to come to work

3  directly for you, but you just run their payroll through

4  Clayton Administrative Services?

5  A    That is correct.

6  Q    And a temporary employee, you call up the agency and

7  say, you know, "My secretary is going to be out for two

8  months, I need a secretary, send some over and let me pick

9  one"?

10  A    That's right.

11  Q    Do you have any greater -- I mean you've told me that

12  you really never had any dealings with Clayton Administrative

13  Services other than if they called about, you know, we've got

14  a discrepancy here about an hourly time or something of that

15  nature?

16  A    Right.  Uh-huh.

17  Q    Do you have any understanding of what Clayton

18  Administrative Services may do for other businesses?  I think

19  Karen DeRocher called them clients, like Konecranes.  Do you

20  know what they do for other folks?

21  A    No.

22  Q    So you really have no knowledge of what Clayton

23  Administrative Services does, other than what you see them do

24  with respect to the three or four employees that are working

25  for Konecranes that are paid through Clayton?

34

1   A    Yeah.  I mean basically my understanding of what Clayton
2   does is totally derived from what I see them do for us.
3   Q    If you had two jobs available -- this is a
4   hypothetical -- and Mr. Nielsen was working for you and he
5   could do either one of them, and one of them is kind of a hot
6   environment with 180-degree furnace all around it or
7   whatever, and another one is in a cool AC that nobody is
8   going to sweat in, and you decide that you want Mr. Nielsen
9   to go take the miserable hot job and send somebody else to
10  the cool AC job, who makes the decision on which one of those
11  jobs he is going to do that day?
12         MR. CRAWFORD:  Object to the form of the question.
13  It's purely hypothetical.
14         Go ahead, subject to my objection.
15  A    Well, you know, basically just about every place we go
16  is miserable and nasty.  You know, I wouldn't necessarily --
17  you know, I can tell you I don't discriminate just because
18  one place is hot and the other one is cool.  But, you know,
19  what we try to do is, we try to look at, you know, what skill
20  set is needed, you know, by what -- the description the
21  customer gives us of the problem.
22  Q    Well, that was probably a poor hypothetical.
23  A    Okay.
24  Q    Who decides which particular job Mr. Nielsen is going to
25  do on a given day?

Brad Howard

35

```
 1   A     The main day-to-day decisions are made by our service
 2   supervisors.  It might even be made by myself if it's a real
 3   high level but, you know, I've got those guys that take care
 4   of running the day-to-day and I let them, you know, do their
 5   jobs.
 6   Q     Would Mr. Nielsen have the right to refuse the job in
 7   the hot warehouse when he knew that he would rather be doing
 8   the job in the cool warehouse?
 9         MR. CRAWFORD:  Same objection to the hypothetical.
10         Go ahead.
11   A     I suppose Mr. Nielsen may not like it, but he is going
12   to go where we tell him to go.
13         MR. ROBERTS:  Let's take a quick break and check on
14   that fax that should be here by now.
15         (Off the record at 1:48 p.m. until 1:55 p.m.)
16   BY MR. ROBERTS:
17   Q     We had previously issued a subpoena back in 2010 to
18   Konecranes, asking for information that they had about Mr.
19   Nielsen, and I'm going to show you one of the documents that
20   we received.  Do you recognize that document?
21   A     Yes.
22   Q     What is that?
23   A     This is the supervisor's follow-up report to any
24   accident that one of our employees has.  You know, like in
25   this case with Mr. Nielsen, you know, we wanted to go ahead
```

Brad Howard

36

1 | and do an investigation into the circumstances of this

2 | accident and fill out this form.  So...

3 | Q    And is that your signature at the bottom?

4 | A    Yes.

5 | Q    Let me see that.  And it says "supervisor's signature."

6 | That's where you signed?

7 | A    Yes.

8 | Q    And you said, "Has the employee returned to work?" and

9 | you had last day worked 9/23/08.  That was after this

10 | accident, wasn't it?  No, that's the date of injury.

11 | A    Yeah, that's the date of the accident.  Uh-huh.

12 | Q    And you put "Return-to-work date, 9/24/08, light duty."

13 | Did Mr. Nielsen return to work on 9/24/08?

14 | A    Honestly, I don't remember.  I do remember seeing

15 | something from his doctor saying that he could return to work

16 | on a light-duty basis.

17 | Q    We took Mr. Nielsen's deposition.  When I asked him

18 | about it, he said the day after the accident he went back up

19 | to Konecranes and was given some sort of shop cleanup duty or

20 | something like that.  Does that sound right to you?

21 | A    That's consistent with normally what we would do.  I

22 | mean basically if we have an employee who is injured, you

23 | know, if the employee is able to come back in any capacity,

24 | whether it's doing filing or, you know, cleaning up the shop

25 | or something like that, that we can keep this employee

Brad Howard

37

1  working, you know, we would offer to do that.

2  Q    Why would you offer to do that?  I mean it sounds to me

3  like you're creating a job that you don't really need done

4  just to accommodate an employee who it's probably not

5  feasible for Konecranes to do that.  Why would you --

6  A    Well, not really.  You see my shop.  No, not really.  I

7  mean, you know, basically we want to keep all of our guys

8  gainfully working.  You know, we want to keep these guys

9  engaged and making things happen for our business.  You know,

10  if a man is out there on one of our job sites, at one of our

11  customer sites and something happens to him, you know, rather

12  than this guy just sitting at home, you know, we want to try

13  to give this guy something that he can come in and do.  And I

14  mean the fact is, you know, you say it's not really something

15  we need.  Really, it is.  You know, come in, he can help us.

16  You know, he can change light bulbs.  You know, just whatever

17  he can do.  And I mean it's benefitting our business.

18  Q    And you're going to be paying him the $17 an hour, or

19  whatever rate that he was earning when he was doing crane

20  maintenance work, to do floor sweeping or light-bulb

21  changing?

22  A    Yes.

23  Q    And is that a decision that you make, or is that a

24  decision that your superior is telling you to try to do?

25  A    Well, it's more or less, you know, my superiors will

Brad Howard

38

1   make the call, you know, in conjunction with my own

2   observations.  But I mean it's something that we've always

3   done since I started in there.

4   Q    Did you have any discussions with Mr. Nielsen about his

5   accident?

6   A    Yes.

7   Q    And do you have a recollection of those discussions and

8   what he told you?

9   A    You know, just the circumstances and what happened.  You

10  know, I did talk with him.  Basically after the accident

11  happened I went out there.  I was called and went out to

12  Graphic and kind of assessed what happened.  You know, Mr.

13  Nielsen was there.  That was before we took him to the

14  hospital, got him checked out and everything.  But, basically

15  just talking about the details of the accident.

16  Q    And that was on the day of the accident you had this

17  conversation with Mr. Nielsen?

18  A    Yes.

19  Q    Have you had any conversations with him since the date

20  of this accident?

21  A    Yes.

22  Q    And when would those have occurred?

23  A    I don't know the dates.  I talked to him, you know, I'm

24  sure the day he came in for the shop cleanup.  I'm sure I

25  talked to him then.  But I mean I know I've talked to him

Brad Howard

39

1  over the phone one time since, but I have no idea what the

2  date was of that conversation.

3  Q    Would it have been shortly after the accident or some

4  recent conversation?

5  A    No, nothing recent.  This was -- you know, this may have

6  been a few months after the accident.  You know, I mean I

7  would call -- let me back up.  I mean I may have talked to

8  him a few times because I would call him and see how he was

9  doing, you know.  But more or less just, you know, that

10  contact.  I haven't talked to Mr. Nielsen in probably a year

11  or more.

12  Q    Do you know what his current physical condition is?

13  A    No.  No idea.

14  Q    If he was released to return to full heavy duty by his

15  doctors and had a doctor's release to do so, would you hire

16  him back?

17  A    I'm not going to say no, but I would have to -- you

18  know, it's basically been a couple of years since he's worked

19  with us.  I mean I would have to sit down and talk with him

20  and see what his capabilities are and things like that.

21  Q    The fact that he was involved in an accident would not

22  preclude him from -- and you've been drug into this to give a

23  deposition and there has been a workers' comp claim filed, I

24  understood, against Clayton.  That wouldn't have any role in

25  your decision on whether or not to hire him back if he was

40

1 | physically capable of doing the work?

2 | A    Not in the case of Mr. Nielsen's specific accident that

3 | he had, no, it wouldn't be a factor in that.

4 | Q    Because you don't feel that he was at fault in that

5 | accident?

6 | A    No.

7 | Q    That's a correct statement?

8 | A    Yes, that's right.

9 | Q    Do you know if Konecranes has changed any of its

10 | policies or procedures as a result of the accident that Mr.

11 | Nielsen had, to try to avoid things like this in the future?

12 |        MR. CRAWFORD:  Object to the form of the question.

13 |        Go ahead.

14 | A    No, nothing -- you know, no change to our normal company

15 | operating procedure.  You know, we did have a meeting with

16 | Graphic's safety -- one of their safety coordinators about

17 | this, and we made a change to how we're performing business

18 | at Graphic.

19 | Q    And what was that change?

20 | A    Basically, anytime we would be out there working on this

21 | particular -- well, there's three cranes on the same runway.

22 | I'm sure you know.

23 | Q    On the same trolley?

24 | A    Yeah, on the same -- well, on the same runway.  Anytime

25 | we're working on one of those three cranes, we would have a

Brad Howard

41

1   ground spotter out there.

2   Q    And who would be the ground spotter?

3   A    It would just -- it would be one of our guys.

4   Basically, we would have one man designated to do nothing but

5   be on the ground watching and making sure that, you know,

6   nothing came down and had a chance to bump into the crane

7   we're working on or something like that.

8   Q    So as I understood what happened in this case, Mr.

9   Nielsen was up in the rafters, so to speak, changing out a

10  mechanical load brake on a crane that was shut down, and

11  another crane that was on the same runway was moved into the

12  crane he was working on.  Is that your understanding?

13  A    Yes.

14  Q    And so now to prevent that from happening, Konecranes

15  stations a guy down there on the ground to stop any other

16  cranes from coming into that vicinity?

17  A    Yes.

18  Q    But Graphic could still use other cranes that were on

19  that same runway, they just couldn't bring them down to where

20  Konecranes would be working.  Is that --

21  A    That's correct.  I mean the ground spotter would stop

22  the crane operator from being able to bring the crane within,

23  you know, too close of a distance.

24  Q    Right.  Because the crane operator has a control that's

25  in his hand that's attached to the crane, so you can't send a

42

1  crane a hundred feet down the way from you?

2  A  No.  No, that's right.

3  Q  You're going to be right there with the crane?

4  A  That's right.

5  Q  I'm going to show you another document.  Let me go ahead

6  and label the first one we used, the supervisor's

7  investigation report, and we'll put H for Howard-1 on that

8  one.

9      Let me show you another document.  I'm going to show you

10  two documents, an H-2 and an H-3 that were in the documents

11  produced by Konecranes to us in this case.  Do you know what

12  those two documents are?

13  A  Yes.  This is part of our packet of paperwork that we

14  would send to Clayton for any new hire or any type of change

15  in one of their employees.

16  Q  And H-2 would be the new hire?

17  A  Well, it's the same form.  Basically, this form captures

18  if it's a new hire or if it's a status change at a higher

19  rate increase or something of that nature.

20  Q  Well, they're dated differently.  It looks like they

21  were filled out differently.  One of them appears to be a

22  $1-an-hour increase?

23  A  Yes.

24  Q  So H-3 is the earlier document, correct, and H-2 is a

25  later document where he got an hour increase?

43

1    A    Yes, that's right.

2    Q    And how long had he been working there when he got that
3    hour increase?

4    A    The $1-per-hour increase was dated 2/29 of '08, so I'm
5    assuming -- you know, he started in '04, so four years.

6    Q    Do you remember participating in that decision to give
7    him a dollar an hour increase?

8    A    Yes.

9    Q    And how did that -- is that just something, he had been
10   there two years or whatever and you decided to give him an
11   increase, or how does that -- did he ask for a raise or what?
12   A    I don't remember if he specifically asked. I know there
13   was a discussion that we had with him about, you know, his
14   capabilities and the things that he had done for us and, you
15   know, going above and beyond as far as working long hours if
16   we needed him to, et cetera, et cetera.  And, you know, we
17   made the determination then we would give him a $1-per-hour
18   raise.

19   Q    Did you consult with Clayton Administrative Services to
20   determine if they would agree to give him a $1-an-hour raise?

21   A    No.

22   Q    Are you aware of any requirement that Clayton
23   Administrative Services has to agree to that $1-an-hour
24   raise?

25   A    No.

Brad Howard

44

1  Q    Do you know that they don't have to, it's a pure

2  unilateral decision on Konecranes' part?

3  A    Basically my perception was, you know, if we decided to

4  give one of these employees a raise, you know, we filled out

5  this form and sent it to Clayton.  And I don't think they

6  really cared.

7  Q    If you wanted to pay him $30 an hour, you could do it?

8  A    That's right.

9  Q    You just end up paying 25 percent more when they send

10  the bill back to you for the --

11  A    Yeah.  Uh-huh.

12  Q    I'm going to show you another document which -- I don't

13  know how many pages it is.  I'll just give you the top page,

14  and I'll give you the rest of them if you want to look at

15  them.  I'll label this H-4.  I'll give you both pages.  I

16  don't know if they're together or not.  What is that H-4

17  document?

18  A    This looks like the new-hire application that we have

19  the new employees fill out for Clayton.

20  Q    And that's on a Clayton form, is it not?

21  A    Yes.

22  Q    Do you keep those forms handy at your office?

23  A    Yes.

24  Q    And does everybody that walks in the door fill out a

25  form that says Clayton Administrative Services and then you

Brad Howard

45

1   decide whether to put them on as a direct employee of

2   Konecranes later, or how does that work?

3   A    No.  Basically, someone that's coming in for the

4   purposes of trying to gain employment with us, we would have

5   them fill out one of our company applications, you know,

6   basically go through the process.  If it's someone we choose

7   that we're going to hire, at that point we'll make a

8   determination if we're going to bring them straight onto

9   Konecranes' payroll or put them on Clayton Administrative's

10  payroll.  If the decision is made that we're going to put

11  them on Clayton's payroll, then we have them fill out

12  Clayton's information.  They are these papers.

13  Q    I may not have been listening to your answer.  So you're

14  telling me that you first decide whether or not you're going

15  to hire them, and then you decide whether or not you're going

16  to put them on with Clayton or put them on with Konecranes,

17  and then you have them fill out the correct application?

18  A    No.  The candidates fill out a Konecranes employment

19  application.

20  Q    All right.

21  A    We go through the interview process.  If we hire the

22  person, at that point we decide if he's going to be a

23  Konecranes employee through our payroll or if he's going to

24  be, you know, an employee through Clayton's payroll.  If it's

25  decided that he's going to be through Clayton's payroll, then

46

1  we'll have the person fill out Clayton's application along

2  with, you know, the rest of the packet of things that they

3  have to fill out for Clayton, and then we'll send that in to

4  them.

5  Q     Have you ever had Clayton reject one of your employees?

6  A     No.

7  Q     Do you know if Konecranes does any kind of background

8  check or drug screen or anything at all in evaluating

9  potential hires?

10  A     Yes, we do.

11  Q     And have you ever done a background check and decided,

12  okay, this popped up. He's got a criminal conviction or

13  whatever, I don't want to hire this guy. Has that happened

14  to you before?

15  A     Yes.

16  Q     And have you had one come back kind of iffy and you

17  said, well, I'm going to hire this guy anyway and didn't have

18  any problems with Clayton? I don't know if that's happened.

19  A     Well, no. No, I haven't had that happen, no. Nothing

20  in, you know, a quote/unquote gray area.

21  Q     Gray areas don't get hired?

22  A     Well, you know, basically our company policy, you know,

23  as far as drug use and convictions and things like that, I

24  mean it's fairly cut and dried, but I've never actually had

25  that. You know, maybe I've been lucky. Never actually had

1   that case present itself.  Yeah, we've got to make sure the

2   employees that we do hire are able to go in and service our

3   customers, and sometimes we have to revert back to customer

4   requirements, background checks and things.

5   Q    Do you know if Clayton conducts a separate drug screen

6   on employees?

7   A    I don't know.

8   Q    Do you provide the results of your drug screens to

9   Clayton?

10  A    I don't believe we do.  I think the drug screen results

11  just go to our own company people.  I don't believe we also

12  send that to Clayton, no.

13  Q    In your affidavit we were previously talking about, you

14  state in Paragraph 4, the second sentence:  "Clayton

15  Administrative Services merely provides a financial service

16  to clients such as Konecranes when they do not wish to claim

17  persons, such as Jonathan Nielsen, as their employees."  Is

18  that a statement you made?

19  A    Yeah.  To my knowledge, that's a true statement.

20  Q    What is the financial service that Clayton provides to

21  clients such as Konecranes?

22  A    The financial service is basically, you know, taking

23  care of their payroll, you know, cutting their pay check,

24  paying their workers' comp.

25  Q    And what Konecranes would then in turn do for Clayton is

1    pay 25 percent more of what Clayton pays to the employee?

2    A    That's right.

3    Q    And you entered into that type of an agreement on

4    numerous times as a manager for Konecranes, Inc.?

5    A    Yes.

6    Q    Other than the obligation of Konecranes to pay 125

7    percent of what Clayton pays the employees, and the

8    reciprocal obligation of Clayton to take care of the payroll

9    and any tax withholdings and handle all that kind of stuff

10   that goes along with payroll, what other agreements are there

11   between Clayton and Konecranes, Inc.?

12         MR. CRAWFORD:  Object to the form of the question.

13   A    None to my knowledge.

14   Q    There is no end-of-the-year accounting obligations or

15   anything of that nature between the two groups?  Just you

16   send the time in and they cut the check to the employee, do

17   all the payroll associated with cutting that check, and then

18   send a bill for 125 percent of what the employee got from

19   Clayton?  That's it?

20   A    As far as I know, that is correct.

21   Q    Ken Lofton, who is that?

22   A    Ken Lofton is the service salesman for the Monroe

23   branch.

24   Q    Who is Gary Wilson?

25   A    Gary Wilson worked for our company sometime in the past.

1   He is no longer employed with us.

2   Q    Mr. Nielsen testified that he was a maintenance

3   technician. Would that be what his title was?

4   A    Service technician.

5   Q    And what are the levels, so to speak, of folks that you

6   supervise? I mean do you have helpers or do you have service

7   technicians, service supervisors? What are the job titles?

8   A    Well, I mean basically we have service technicians. We

9   also have full-time inspectors, crane inspectors, and then we

10  have service supervisors. We have contract sales and service

11  salespeople. We have a branch administrator. You know,

12  those are all the people that I oversee.

13  Q    How many service technicians did you have at the time of

14  Mr. Nielsen's accident?

15  A    I believe I had -- I want to say at that time I had 12.

16  Q    And of those 12 how many were Clayton employees and how

17  many were --

18  A    Well, I didn't count the Clayton employees in that. I

19  was talking about I had 12 Konecranes people. At the time of

20  Mr. Nielsen's accident, I think I had -- I had 12 full-time

21  Konecranes employees, and then I had maybe two guys like Mr.

22  Nielsen that I called for, you know, any overflow situations

23  through Clayton.

24  Q    Now, you testified that Mr. Nielsen was -- he would work

25  more than most overflow employees. I mean these overflow

Brad Howard

50

1  guys, I was thinking you might use them eight hours a week or
2  something. Is that --
3  A    Yeah. I mean we would use -- a typical guy, we would
4  use him here and there. I mean some of the guys even had
5  their own -- they had full-time jobs and they would come and
6  help us on a weekend or something like that. You know, their
7  company didn't prohibit them from doing that. In Mr.
8  Nielsen's case, he did not have a full-time job. You know,
9  his primary source of income, I guess, was working doing
10 things through Clayton with us. So basically that made Mr.
11 Nielsen a lot more available to us if we ever needed him,
12 even if it was short notice, which sometimes with our
13 business it is short notice that we have to put a sizable
14 crew of people together.
15 Q    Well, did Mr. Nielsen always work 40 hours a week?
16 A    No.
17 Q    Did all your service technicians always work 40 hours a
18 week that were not Clayton employees?
19 A    Yes.
20 Q    I think you told me you provided Mr. Nielsen with a
21 uniform?
22 A    Yes.
23 Q    And that's just because he was -- why did you decide to
24 provide him with a uniform if you didn't provide other
25 Clayton employees with a uniform?

1  A    Just because we used Mr. Nielsen a lot more often and,

2  you know, there may have been some -- I'm trying to remember

3  back now at the time whenever we purchased the uniforms. I'm

4  not sure if there was -- there may have been a customer

5  requirement for FRP or something like that and, you know,

6  rather than making Mr. Nielsen provide his own, we decided to

7  go ahead and get him something when we bought it for all the

8  rest of our employees.

9  Q    Whose tools did Mr. Nielsen use when he was doing his

10  job?

11  A    He used his.

12  Q    Whose tools do other service technicians use?

13  A    They provide their own.

14  Q    What if you've got a need for some kind of a $20,000

15  piece of equipment?

16  A    If it's some type of specialty tool or something like

17  that, then we would provide that for the employees.

18  Q    "We" being Clayton?

19  A    No.

20  Q    I mean "we" being Konecranes?

21  A    Konecranes. That's right.

22  Q    Clayton never provided anybody's tools?

23  A    No.

24  Q    That's correct?

25  A    Yes. That's right.

1    Q    How often did you pay your own employees?

2    A    They are paid every other week.

3    Q    Do you know how often Clayton paid its employees?

4    A    No, I don't know offhand.

5    Q    Did you ever have any discussions with Mr. Nielsen about

6    whether or not he was going to make a worker's compensation

7    claim or file a lawsuit as a result of this accident?

8    A    Yes.

9    Q    And when was that?

10   A    I don't remember the exact date.

11   Q    What did he tell you about that?

12   A    Basically, I received a phone call from Mr. Nielsen one

13   day, and during that conversation he told me that he was -- I

14   guess at that point he had talked to an attorney, and that he

15   was looking to filing some type of lawsuit because of this

16   matter.  And he basically told -- he basically called asking

17   me for Konecranes to pay him some money.

18   Q    And do you know, did he have an attorney at that time,

19   to your knowledge?

20   A    I don't know.

21   Q    Did he make a specific monetary demand?

22   A    No.

23   Q    Did he say he was looking for Konecranes to pay him some

24   money so he wouldn't file a lawsuit?

25   A    No, he didn't say it that way.  I mean basically what he

1    said was that he got hurt on a job site for Konecranes, even

2    though he was not a Konecranes employee, and he felt that

3    Konecranes should, I guess, monetarily compensate him for,

4    you know, the fact that he can't work or something like that.

5    Q    Do you know whether or not he was receiving workers'

6    compensation benefits at the time of this conversation?

7    A    I have no idea.

8    Q    Do you know whether or not he has ever received any

9    workers' compensation benefits?

10   A    The last time that I heard anything about anything he

11   was receiving, it was my understanding that Clayton was

12   paying 40 hours a week to him.

13   Q    Do you know if Konecranes has ever had to reimburse

14   Clayton for any workers' compensation benefits they may have

15   paid to Mr. Nielsen?

16   A    No, we haven't.

17   Q    You know that you haven't?

18   A    To my knowledge, we haven't.  I would think if we had to

19   have, I would've known about it.

20   Q    Have you ever had any other workers that were employed

21   directly by Clayton Administrative Services, Inc. make a

22   workers' compensation claim?

23   A    Yes.

24   Q    And when was that?

25   A    I don't remember offhand.  I don't remember the date.

1  It was -- there may have been a case sometime in 2009.

.2  Basically, I think it was in 2009 we had an employee that got

3  a hand injury, an injury to his finger and -- well, now, I

4  don't know if that was workman's comp or not because this guy

5  was on light duty. So I guess I haven't. I'm sorry. I'm

6  trying to remember the details here. But, no, there was no

7  workman's comp claim in that case. So, no, I haven't.

8  Q    In that case did you have to communicate with Clayton

9  about the injuries to that worker?

10  A    No.

11  Q    But that employee you're talking about was a Clayton

12  employee, not a direct employee of Konecranes?

13  A    That's correct.

14  Q    Have you had to have any communication with Clayton

15  about the accident or the injuries to Mr. Nielsen?

16  A    I received a call. It was before the last call I

17  received from Mr. Nielsen. I received a call from a man

18  named Gary. I think his name was Gary. I don't know his

19  last name. But he was someone with Clayton that basically

20  told me that Mr. Nielsen was not working, that Clayton was

21  paying him 40 hours a week and he was at home. And Gary

22  wanted to know if I could put Mr. Nielsen to work in some

23  type of capacity in my shop. And he said that it would not

24  cost me -- it would not cost Konecranes anything. Basically,

25  he just didn't want to pay Mr. Nielsen and Mr. Nielsen sit at

1   home. And I basically told Gary that no, I didn't have any
2   use for Mr. Nielsen at that time.

3   Q   Was he telling you that if you could put him to work in
4   your shop doing some light-duty job that you would not even
5   have to pay the 25 percent markup?

6   A   Yeah. Yeah, that's what he said. He said it wouldn't
7   cost Konecranes anything.

8   Q   And you elected not to do that?

9   A   No. No, I didn't. I told him I didn't have the need
10   for it.

11   Q   Even though you could get him in cleaning up that messy
12   shop of yours, you decided not to do it?

13   A   No. No, I didn't have the need at that time. You know,
14   I just -- I didn't feel like it was something we needed to
15   do, so we didn't do it.

16   Q   Do you know about how long after the accident it was
17   when you had this conversation?

18   A   It was -- I mean it was a few months. I mean it wasn't
19   a year or, you know, anything longer than that. It was, you
20   know, I'd say probably, you know, three or four months.

21   Q   Have you had any conversations or communication with
22   Karen DeRocher at Clayton?

23   A   No, I have not.

24   Q   Do you know who she is?

25   A   No.

Brad Howard

56

1   Q   We took Karen DeRocher's deposition and she produced for

2   us as Clayton No. 4 a printout like this --

3   A   Okay.

4   Q   -- of Mr. Nielsen's payroll history. Is this something

5   that you would ever see or get a copy of? I'll be happy to

6   show it to you.

7   A   No. No, I've never seen that.

8   Q   Does Konecranes keep any records going back for every

9   hour that Mr. Nielsen would have worked for Konecranes?

10   A   Not specifically. Basically, if Mr. Nielsen goes out

11   and works on one of our job sites, at the end of that job the

12   time tickets would be put into that jobs folder. We have a

13   folder for each job. Mr. Nielsen's time ticket would be

14   included in that folder with the time tickets of the other

15   employees. But we have nothing that's called out

16   specifically for Clayton people, you know, their time or

17   things like that.

18   Q   The documents that I've got today with me that were

19   produced by Konecranes, everything you see here, and I'll be

20   happy to show it all to you, I think this was a -- you know,

21   we had asked for all documents pertaining to Mr. Nielsen.

22   This is what we got. Do you have a file thicker than that or

23   have you got more documents than that?

24   A   No. No. We keep a very limited amount of information

25   on file for, you know, Clayton administrative employees. I

Brad Howard

57

1  would say a lot of that has probably to do with the accident.

2  Q    Yeah, it is.  I mean there is an application --

3  A    Yeah.

4  Q    -- and there's some stuff I showed you that showed his

5  wage increase and maybe a few other documents.  But that's

6  basically all you would keep?

7  A    That's everything I have, yes.

8       MR. ROBERTS:  I'll pass the witness.  You got any

9  questions?

10      MR. CRAWFORD:  Yeah, just a few.

11                        EXAMINATION

12  BY MR. CRAWFORD:

13  Q    Mr. Howard, Brian Crawford, for the plaintiff, Mr.

14  Nielsen.

15      Let me explore with you in some more detail the line of

16  questioning that you and Mr. Roberts were talking about,

17  specifically as it relates to the distinction between

18  Clayton, as what you call the financial service provider, and

19  temporary services or labor pool providers.  You went into

20  some detail about how you characterize that distinction.  Let

21  me go into a little bit more of that with you.  Am I correct

22  in understanding that Konecranes' relationship with Clayton

23  is essentially just the opposite of what Konecranes'

24  relationship ordinarily would be with a temporary service or

25  labor provider in that Konecranes actually recruits and

1  decides whether to bring on that employee and it sends that

2  person to Clayton as opposed to Clayton sending the person to

3  Konecranes?  Isn't it just the opposite of a temporary labor

4  pool provider?

5  A     Yes.

6  Q     Because your company is actually going out and

7  recruiting and Clayton is not recruiting someone like Mr.

8  Nielsen, is it?

9  A     No.

10  Q     Clayton is not training someone like Mr. Nielsen, is it?

11  A     Correct.

12  Q     Clayton doesn't even make the decision to hire someone

13  like Mr. Nielsen; that person is simply delivered to them by

14  Konecranes in accordance with whatever this loose arrangement

15  is.  Would that be a fair statement?

16  A     That's correct, yes.

17  Q     You didn't really discuss this in any detail with Mr.

18  Roberts.  But as I understand a traditional or routine type

19  of subcontracting relationship, which you seem to have

20  acknowledged having had some experience with, for instance,

21  if Graphic is the principal in this arrangement and

22  Konecranes negotiates a contract with Graphics and Konecranes

23  wishes to hire out some portion of that work to some other

24  third entity, Konecranes will then go to that third person,

25  whether it's a temporary labor pool service or some other

Brad Howard

59

1  skill set of temporary people, and you'll actually enter into

2  a subcontract with those people. Is that correct?

3  A   That's correct.

4  Q   Didn't have any kind of a contract like that at all with

5  Clayton, did you?

6  A   Not to my knowledge.

7  Q   Now, you know, I'm thinking about this this morning and

8  I was looking at the name Clayton Administrative Services.

9  Isn't it true that, as its name implies, Clayton really

10  provides nothing more than an administrative service to

11  Konecranes?

12  A   Yes.

13  Q   Does it provide any service, skills, work or activity

14  other than to act as a payroller?

15  A   No.

16  Q   Now, in discussion with Ms. DeRocher, one of us -- I

17  don't remember whether it was Mr. Roberts or whether it was

18  me -- asked her to define a payroller, and she stated that a

19  payroller exists when a customer wants to hire someone but

20  does not want them on their payroll and does not want them as

21  an employee, so they will have an outside company like

22  Clayton Administrative Services pay them on their behalf.

23  Isn't that what happened here?

24  A   Yes.

25  Q   Nothing more, nothing less?

1  A    That's correct.

2  Q    Am I also correct in understanding that Clayton had

3  nothing whatsoever to do with either soliciting employees or

4  contracts, or work to be performed on either this project

5  with Graphic or any other project in which you're aware?

6  A    That's correct.

7  Q    Mr. Howard, isn't it true that at the time of this

8  particular accident Konecranes did not wish to have Jonathan

9  Nielsen as a full-time employee or a direct employee of

10  Konecranes?

11  A    That's correct.

12  Q    And am I also correct in understanding, from a very

13  brief conversation I may have had with you earlier today,

14  that one of the reasons that Konecranes did not wish to have

15  Jonathan hired as a direct or a full-time employee but rather

16  to be a payroller with Clayton was because, at least in your

17  mind, he had not reached the level of expertise and knowledge

18  and skills that you deemed appropriate for him to be placed

19  in such a position?

20  A    That's correct.

21  Q    Just for clarification of the record, since you were

22  talking with Mr. Roberts about this affidavit --

23          MR. CRAWFORD:  Colly, what was your last number?

24          MR. ROBERTS:  H-4, and I don't know that we need

25  the second page of H-4.  So that would be H-5.  I just

Brad Howard

1    referred to it as Document 61-1.  If you want to --

2         MR. CRAWFORD:  Yeah, it's 61-1.  I'll go ahead and

3    just for purposes of making it part of this deposition

4    record, I'll mark it as H-5.

5    Q    And I believe you've identified this as an affidavit

6    that you executed on March 17th of 2011.  That's your

7    signature or a copy of your signature?

8    A    Yes.

9    Q    And is the information contained therein in the several

10   paragraphs true and correct to the best of your direct

11   knowledge and information?

12   A    Yes.  To the best of my knowledge, it is correct.

13   Q    Any questions come up today or any information that has

14   been developed since the time you executed that affidavit

15   which would cause you to modify any of the factual statements

16   that you've set forth in this affidavit?

17   A    No.

18        MR. CRAWFORD:  Nothing further.  Thanks.

19                    FURTHER EXAMINATION

20   BY MR. ROBERTS:

21   Q    Just to clarify.  It is true, though, is it not, that

22   Mr. Nielsen was performing part of the contract that

23   Konecranes had with Graphic to change out the load brake on

24   this 50-ton dry end crane?

25        MR. CRAWFORD:  Same objection as earlier stated.

Brad Howard

1       Go ahead.

2   A    Yes.  Mr. Nielsen was part of the work group that was

3   performing the work under this contract.

4   Q    And as a result of that work for those hours that he

5   spent changing out that load brake that Konecranes was

6   contractually obligated to do for Graphic, you paid him 125

7   percent of $17 an hour?

8       MR. CRAWFORD:  Object to the form of the question.

9   Q    Or you paid Clayton 125 percent --

10  A    Yeah.

11  Q    -- of $17 an hour?

12  A    That's correct.

13      MR. ROBERTS:  I have no further questions.

14      MR. CRAWFORD:  Nothing further.  Thank you very

15  much, Mr. Howard.

16      THE REPORTER:  Read and sign?  Did you ask him?

17      MR. ROBERTS:  You have the right in Louisiana to

18  read and sign your deposition or you can waive the reading

19  and signing of the deposition.

20      (Off-the-record comments.)

21      MR. ROBERTS:  Most people waive it unless they're

22  worried about, you know, the transcript or there is a bunch

23  of technical terms that you may not be able to assure are

24  typed correctly.  But you can do whatever you want to.

25      THE WITNESS:  I don't see a reason why I would need

Brad Howard

63

1    to review it.

2           MR. ROBERTS:  All right.  Well, we can send you a

3    copy of it once it's done.

4           THE WITNESS:  Okay.

5           (Deposition concluded at 2:40 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Brad Howard

64

### REPORTER'S CERTIFICATION

I, BETTY P. TOMS, a certified court reporter in and for the State of Louisiana, authorized by the laws of said state to administer oaths and to report the depositions of witnesses, hereby certify that the foregoing deposition of BRAD HOWARD was taken at the time and place hereinabove stated; that said witness was duly sworn to testify to the truth, the whole truth, and nothing but the truth in answer to the questions propounded; that the testimony was reported by me and transcribed under my personal direction and supervision; that the foregoing transcript is a true and correct transcript to the best of my ability and understanding; that I am not of counsel or related to any of the parties to this cause, or in their employ; and that I am in no way interested in the outcome of said cause.

I further certify that I have delivered the original deposition transcript to Mr. Caldwell Roberts, Jr., counsel for Defendants, Graphic Packaging International, for filing with the Court or for safekeeping.

Witness my hand and official seal this 20th day of April, 2011.

Betty P. Toms, CCR #88032



OFFICIAL SEAL
BETTY P. TOMS
Certified Court Reporter
in and for the State of Louisiana
Certificate Number 88032
Certificate expires 12-31-11

## SUPERVISOR'S INVESTIGATION REPORT
### TO BE COMPLETED BY EMPLOYEE'S SUPERVISOR
(please print in ink)

Employee Name: __Jonathan Nielsen__   Soc. Sec. # ▓▓▓▓▓▓▓▓

Date of Injury: __9|23|08__

Was an Investigation completed concerning the circumstances of this injury?   (p Yes)   p No

Were there any witnesses to this injury?   (p Yes)   p No
    If yes, witness statements should be attached.

Was the injury a result of horseplay? Under the influence of drugs, or   p Yes   (p No)
    Purposely self-inflicted? If yes, please specify:
_____

_____

Has there been any recent disciplinary action taken against this employee?   p Yes   (p No)
    If yes, please describe:
_____

Has the employee missed any work previously due to similar industrial or   p Yes   (p No)
    Non-industrial conditions? If so, when?_____

Has the employee submitted medical documentation for the injury?   (p Yes)   p No
    If yes, please attach.

If known, please provide us with the name, address and telephone number
    Of the attending physician:
_____

Has the employee returned to work?   (p Yes)   p No
    Last day worked __9|23|08__        Returned to work date: __9|24|08 (Light Duty)__
    If not, what is the current estimated date of return? __Full Duty - 9|29|08__

If the employee died, when did death occur? Date of death:_____

With the information you have, would you recommend the claim be accepted?   (p Yes)   p No
    If no, why? _____

__Brad Howard__ (signature)                 __Service Manager__          __9|24|08__
Supervisor's signature                        Title                        Date

__Brad Howard__
Supervisor's printed name

**PLEASE ATTACH COMPLETED INJURY REPORTS, WITNESS STATEMENTS AND ANY ACCUMULATED MEDICAL BILLS AND INFORMATION. ADDITIONAL COMMENTS MAY BE NOTED ON THE REVERSE SIDE.**

Revision #0205

EXHIBIT
HOWARD - 1
4-12-2011

H - 1

*Clayton*
**PERSONNEL**
S E R V I C E S

### TEMPORARY EMPLOYEE
### PERSONNEL AUTHORIZATION FORM

| Employee Name | | | Effective Date | Date of Last Increase |
|---|---|---|---|---|
| John Nielsen | | | 2-25-08 | |
| Social Security # ☐ | ☐ | | New Hire (Rate Increase) | Status Change  Other |
| General Ledger Acct or Dept # | From | To | Comments | Remarks |
| Job Title | Helper | | | |
| Work Location | Monroe+CPS | | | |
| Supervisor | Spence Turner | | | |
| Rate of Pay | $17 an hour | | $1 an hour increase | |
| Payroll Contact Authorizing Signature: | Spence Turner | | Date 2-29-08 | |

Please ensure completion of the new hire packet including completion of Section 2 of the I-9. If possible obtain copies of the I-9 backup and attach to the new hire packet.

EXHIBIT
HOWARD - 2

H - 2

## *Clayton*
### P E R S O N N E L
### S E R V I C E S

## TEMPORARY EMPLOYEE
## PERSONNEL AUTHORIZATION FORM

| Employee Name | | | Effective Date | Date of Last Increase |
|---|---|---|---|---|
| John Nielsen | | | 6-17-05 | |
| Social Security # | ☐ | ☐ | New Hire ☐ Rate Increase ☐ | Status Change ☐ Other ☐ |
| General Ledger Acct or Dept # | From | To | Comments | Remarks |
| Job Title | | | | |
| Work Location | | | | |
| Supervisor | | | | |
| Rate of Pay | | 16 ⁰⁰ | | |

| Payroll Contact Authorizing Signature: | _(signature)_ | Date 6-17-05 |
|---|---|---|

Please ensure completion of the new hire packet including completion of Section 2 of the I-9. If possible obtain copies of the I-9 backup and attach to the new hire packet.

_(handwritten signature)_

**EXHIBIT**
HOWARD - 3
4-12-2011   b-toms

H-3

# APPLICATION FOR EMPLOYMENT
(PRE-EMPLOYMENT QUESTIONNAIRE)   (AN EQUAL OPPORTUNITY EMPLOYER)

## PERSONAL INFORMATION

DATE _10-28-03_

NAME _Nielsen_ _John_ _Rush_
LAST   FIRST   MIDDLE

SOCIAL SECURITY NUMBER ▆▆▆▆▆▆

PRESENT ADDRESS _P.O. Box 216_ _Arcadia_ _LA_ _71001_
STREET   CITY   STATE   ZIP

PERMANENT ADDRESS
STREET   CITY   STATE   ZIP

PHONE NO. ▆▆▆▆▆▆   ARE YOU 18 YEARS OR OLDER?  Yes ☒  No ☐

ARE YOU EITHER A U.S. CITIZEN OR AN ALIEN AUTHORIZED TO WORK IN THE UNITED STATES?  Yes ☒  No ☐

## EMPLOYMENT DESIRED

POSITION

DATE YOU CAN START

SALARY DESIRED

ARE YOU EMPLOYED NOW?

IF SO MAY WE INQUIRE OF YOUR PRESENT EMPLOYER?

EVER APPLIED TO THIS COMPANY BEFORE?   WHERE?   WHEN?

REFERRED BY

| EDUCATION | NAME AND LOCATION OF SCHOOL | *NO OF YEARS ATTENDED | *DID YOU GRADUATE? | SUBJECTS STUDIED |
|---|---|---|---|---|
| GRAMMAR SCHOOL | | | | |
| HIGH SCHOOL | | | | |
| COLLEGE | | | | |
| TRADE, BUSINESS OR CORRESPONDENCE SCHOOL | | | | |

## GENERAL

SUBJECTS OF SPECIAL STUDY OR RESEARCH WORK

SPECIAL SKILLS _12 V Tech, Firefighter I, EMT, Haz Mat Awareness_

ACTIVITIES (CIVIC, ATHLETIC, ETC.) _North Bienville Fire District, Paffard Ambulance_
EXCLUDE ORGANIZATIONS, THE NAME OF WHICH INDICATES THE RACE, CREED, SEX, AGE, MARITAL STATUS COLOR OR NATION OF ORIGIN OF ITS MEMBERS

U.S. MILITARY OR NAVAL SERVICE   RANK   PRESENT MEMBERSHIP IN NATIONAL GUARD OR RESERVES

*The Age Discrimination in Employment Act of 1967 prohibits discrimination on the basis of age with respect to individuals who are at least 40 years of age.

(CONTINUED ON OTHER SIDE)   LITHO IN U.S.A.

EXHIBIT
HOWARD-4
4-12-2011   btoms

H-4

**FORMER EMPLOYERS** (LIST BELOW LAST THREE EMPLOYERS, STARTING WITH LAST ONE FIRST).

| DATE MONTH AND YEAR | NAME AND ADDRESS OF EMPLOYER | SALARY | POSITION | REASON FOR LEAVING |
|---|---|---|---|---|
| FROM | | | | |
| TO | | | | |
| FROM | | | | |
| TO | | | | |
| FROM | | | | |
| TO | | | | |
| FROM | | | | |
| TO | | | | |

**WHICH OF THESE JOBS DID YOU LIKE BEST?**

**WHAT DID YOU LIKE MOST ABOUT THIS JOB?**

**REFERENCES:** GIVE THE NAMES OF THREE PERSONS NOT RELATED TO YOU, WHOM YOU HAVE KNOWN AT LEAST ONE YEAR.

| NAME | ADDRESS | BUSINESS | YEARS ACQUAINTED |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |

IN CASE OF EMERGENCY NOTIFY *Vicki Guice*    *PO Box 216*    245-5094 cell
NAME                ADDRESS       -263-0033 work
                              318-263-2583 Home
                              PHONE NO.

"I CERTIFY THAT THE FACTS CONTAINED IN THIS APPLICATION ARE TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE AND UNDERSTAND THAT, IF EMPLOYED, FALSIFIED STATEMENTS ON THIS APPLICATION SHALL BE GROUNDS FOR DISMISSAL.

I AUTHORIZE INVESTIGATION OF ALL STATEMENTS CONTAINED HEREIN AND THE REFERENCES LISTED ABOVE TO GIVE YOU ANY AND ALL INFORMATION CONCERNING MY PREVIOUS EMPLOYMENT AND ANY PERTINENT INFORMATION THEY MAY HAVE, AND RELEASE ALL PARTIES FROM ALL LIABILITY FOR ANY DAMAGE THAT MAY RESULT FROM FURNISHING SAME TO YOU.

I UNDERSTAND AND AGREE THAT, IF HIRED, MY EMPLOYMENT IS FOR NO DEFINITE PERIOD AND MAY, REGARDLESS OF THE DATE OF PAYMENT OF MY WAGES AND SALARY, BE TERMINATED AT ANY TIME WITHOUT PRIOR NOTICE AND WITHOUT CAUSE."

DATE *10-28-03*    SIGNATURE X *John Avila*

---

### DO NOT WRITE BELOW THIS LINE

INTERVIEWED BY                                          DATE

REMARKS:

NEATNESS                          ABILITY

HIRED: ☐ Yes  ☐ No        POSITION              DEPT.

SALARY/WAGE                       DATE REPORTING TO WORK

APPROVED: 1.                  2.                  3.
            EMPLOYMENT MANAGER      DEPT. HEAD         GENERAL MANAGER

This form has been designed to carefully comply with State and Federal fair employment practice laws prohibiting employment discrimination. This Application for Employment Form is sold for use anywhere throughout the United States. 100% assumes no responsibility for the inclusion in said form of any questions which, when asked by the Employer of the Job Applicant, may violate State and/or Federal Law.

STATE OF LOUISIANA

PARISH OF OUACHITA

### AFFIDAVIT

BEFORE ME, the undersigned Notary Public in and for the State of Louisiana, Parish of Ouachita, personally came and appeared Brad Howard, who, after being first duly sworn, did depose and state the following:

1.    Appearer is employed by Konecranes Incorporated in the capacity of Branch Manager.

2.    Appearer has been informed that the defendant Graphic Packaging, Inc. has claimed that Clayton Administrative Services, the employer of Jonathan Nielsen, was a "subcontractor" in connection with work performed by Konecranes at Graphic Packing Inc.'s place of business in Ouachita Parish, Louisiana, on September 23, 2008.

3.    Konecranes did not enter into any agreement with Clayton Administrative Services whereby Clayton Administrative Services performed any part of the work which may have been contracted between Konecranes and Graphic Packaging, Inc. on the date of Jonathan Nielsen's accident of September 23, 2008.

4.    Appearer states that he has personal knowledge that Clayton Administrative Services is not an employment labor pool provider or a temporary labor provider with its clients. Clayton Administrative Services merely provides a financial service to clients such as Konecranes when they do not wish to claim persons, such as Jonathan Nielsen, as their employees.   .

5.    Appearer further has personal knowledge that Clayton Administrative Services did not agree to perform any specific work undertaken by Konecranes at Graphic

$H - 5$

EXHIBIT

HOWARD -5

4-12-2011



EXHIBIT

Packing, Inc., on the date of Jonathan Nielsen's accident.

      6.     Appearer has personal knowledge and can attest to the fact that Clayton Administrative Services is a payroller and is not a labor pool provider. Appearer is aware of no oral or written contract between Konecranes and Clayton Administrative Services whereby Clayton Administrative Services became a subcontractor to Konecranes in connection with any services provided by Konecranes.

      7.     Appearer further declares that he is personally aware of the fact that Clayton Administrative Services had no knowledge of or participation in any contractual relationships between Konecranes and Graphic Packaging, Inc.

      Affiant further declares that all facts contained herein are true and correct to the best of Affiant's knowledge, information and belief.

                              _____
                                BRAD HOWARD

      This affidavit executed before me, the undersigned Notary Public in and for Ouachita Parish, Louisiana ____ day of March, 2011.

                    _____
                        NOTARY

FAYE McMICHAEL - ID # 43396
NOTARY PUBLIC IN AND FOR
LINCOLN PARISH, LOUISIANA

**A**

ABB 6:22,24,25
7:4,5,7,24
ability 64:12
able 36:23 41:22
47:2 62:23
AC 34:7,10
Acadian 2:19
accommodate
37:4
accounting
48:14
acknowledged
58:20
acquired 27:16
act 59:14
activity 59:13
actual 7:12
additional 10:19
14:5
address 5:15,16
administer 64:4
Administrative's
45:9
administrator
22:15 23:2 24:2
49:11
advantages
26:19,22,24
27:1
affidavit 4:15
28:2 47:13
60:22 61:5,14
61:16
agency 33:6
ago 5:4 15:9
agree 19:3 43:20
43:23
agreed 30:20
32:17
agreement 14:18
29:11,18 30:2,4
30:7 31:25 48:3
agreements
31:23 32:2
48:10

ahead 16:13 23:1
27:14,19 29:23
30:17 34:14
35:10,25 40:13
42:5 51:7 61:2
62:1
Alabama 21:18
allowed 3:4
14:14
amount 56:24
annual 25:3,12
answer 5:13
20:24 45:13
64:8
anybody 20:18
anybody's 51:22
anytime 40:20,24
anyway 46:17
APPEARANCES
2:1
appears 42:21
application 4:13
44:18 45:17,19
46:1 57:2
applications
45:5
apply 14:22
appreciate 25:20
appropriate
60:18
approve 18:10
approved 17:2
18:13 19:8
April 1:17 64:21
area 46:20
areas 46:21
arrangement
11:21 19:16
58:14,21
asked 36:17
43:12 56:21
59:18
asking 12:19,21
35:18 52:16
assessed 38:12
associated 48:17

assume 5:12
19:5
assuming 43:5
assure 62:23
attached 41:25
attorney 2:8 28:4
52:14,18
August 7:23
Authorization
4:8,11
authorized 64:3
available 34:3
50:11
Avenue 1:17
avoid 40:11
aware 22:2,3
43:22 60:5

**B**

back 16:20 19:12
35:17 36:18,23
39:7,16,25
44:10 46:16
47:3 51:3 56:8
background 7:14
46:7,11 47:4
based 12:25 19:8
basis 17:3,3 32:2
32:20 36:16
Baton 2:20
becoming 26:13
26:19,24
behalf 59:22
believe 5:4 6:3
11:4 15:9 20:14
28:9 47:10,11
49:15 61:5
beneficial 23:19
23:20
benefits 26:20
27:2,4 53:6,9
53:14
benefitting 37:17
best 61:10,12
64:12
Betty 1:23 64:2

64:23
beyond 27:12
43:15
big 8:11 11:21
31:4
bill 19:12,14
44:10 48:18
bit 7:10 57:21
biweekly 17:3
bosses 24:10
bottom 36:3
bought 8:4 51:7
Box 2:4,19
Brad 1:14 3:2
4:15 5:1,16
64:6
brake 17:6 41:10
61:23 62:5
branch 5:22 6:4
6:10,17,19 10:7
10:8,9 19:17
28:24 32:11
48:23 49:11
break 5:14 35:13
Brian 2:3 57:13
brief 60:13
bring 11:23 18:2
23:9,9 24:6,7
25:19 41:19,22
45:8 58:1
bringing 32:17
broad 15:3
brought 7:4
Brown 7:3,3
bulbs 37:16
bump 41:6
bunch 62:22
business 6:20
22:22 29:6 37:9
37:17 40:17
50:13
businesses
33:18
busy 11:22 13:21
button-down
15:22

**C**

Caldwell 2:12
64:17
called 33:13,19
38:11 49:22
52:16 56:15
candidates
32:14,16 45:18
capabilities
39:20 43:14
capable 31:15
40:1
capacity 7:9
28:24 36:23
54:23
captures 42:17
care 24:13 35:3
47:23 48:8
cared 44:6
case 15:7,11
31:12 32:3
35:25 40:2 41:8
42:11 47:1 50:8
54:1,7,8
cause 61:15
64:14,15
CCR 1:23 64:23
certain 21:8
CERTIFICATION
64:1
certified 64:2
certify 64:5,16
cetera 43:16,16
chance 41:6
change 6:7 17:5
22:4,5,6 37:16
40:14,17,19
42:14,18 61:23
changed 6:8 8:2
40:9
changes 22:2
28:15
changing 37:21
41:9 62:5
characterize
57:20

Brad Howard

check 35:13 46:8
  46:11 47:23
  48:16,17
checked 38:14
checks 47:4
choose 23:11
  45:6
circumstances
  36:1 38:9
Civil 3:4
claim 39:23
  47:16 52:7
  53:22 54:7
claimed 29:3
clarification
  60:21
clarify 61:21
classified 24:13
Clayton's 45:11
  45:12,24,25
  46:1
cleaning 36:24
  55:11
cleanup 36:19
  38:24
clerical 32:11
clients 33:19
  47:16,21
close 41:23
collectively 23:6
  24:4
Colly 5:5 11:8
  27:20 60:23
come 5:7 14:6
  16:20 20:21
  22:7 27:22
  28:10 31:14
  33:2 36:23
  37:13,15 46:16
  50:5 61:13
comes 15:11
  18:21
coming 7:5
  26:16 41:16
  45:3
commenced

21:3,10
commencing
  1:17
comments 62:20
communicate
  54:8
communication
  20:8,17 54:14
  55:21
comp 39:23
  47:24 54:4,7
companies 10:6
  14:9
comparable
  13:18
compensate
  53:3
compensation
  2:17 52:6 53:6
  53:9,14,22
concluded 63:5
conclusion
  30:16
condition 39:12
conducts 47:5
conjunction 38:1
connection 29:5
consider 10:23
  24:12 31:1 32:8
consistent 25:14
  25:15,24 36:21
consistently
  15:16 25:18
consult 43:19
contact 20:17,25
  39:10
contained 61:9
contract 7:1,4
  30:18 49:10
  58:22 59:4
  61:22 62:3
contracted 29:13
  29:20
contractor 6:22
  7:2
contracts 60:4

contractually
  62:6
control 41:24
conversation
  38:17 39:2,4
  52:13 53:6
  55:17 60:13
conversations
  20:9,9 38:19
  55:21
conveyed 27:16
conviction 46:12
convictions
  46:23
cool 34:7,10,18
  35:8
coordinators
  40:16
copy 20:6 28:4
  56:5 61:7 63:3
CORPORATION
  2:17
correctly 62:24
cost 24:12 54:24
  54:24 55:7
cotton 15:23
counsel 3:2
  64:13,17
count 49:18
country 8:12
couple 5:4 39:18
court 1:1 64:2,19
cranes 7:8 11:2
  12:3 24:20 25:4
  40:21,25 41:16
  41:18
Crawford's 28:9
  28:12
creating 37:3
Creswell 2:13
crew 30:2 50:14
criminal 46:12
current 5:19
  39:12
customer 34:21
  37:11 47:3 51:4

59:19
customers 47:3
cut 46:24 48:16
cutting 47:23
  48:17

D
daily 17:1
Daphne 21:18
date 4:8,11 6:8
  29:14,20 30:10
  30:19 36:10,11
  36:12 38:19
  39:2 52:10
  53:25
dated 4:13 42:20
  43:4
dates 38:23
day 15:25 18:1
  19:11 24:7 30:1
  31:5 34:11,25
  36:9,18 38:16
  38:24 52:13
  64:20
days 23:12 24:9
day-to-day 16:4
  16:23 35:1,4
deal 19:22 20:23
dealings 33:12
decide 22:17,22
  24:3 34:8 45:1
  45:14,15,22
  50:23
decided 32:15
  43:10 44:3
  45:25 46:11
  51:6 55:12
decides 34:24
  58:1
decisions 35:1
deemed 60:18
defendant 29:2
Defendants 2:11
  3:3 64:18
define 59:18
degree 7:17

delivered 58:13
  64:16
demand 52:21
depending 12:22
deposition 1:13
  3:2,6 5:8,8
  36:17 39:23
  56:1 61:3 62:18
  62:19 63:5 64:5
  64:17
depositions 64:4
derived 34:2
DeRocher 33:19
  55:22 59:16
DeRocher's 56:1
described 31:10
description
  34:20
designated 41:4
detail 57:15,20
  58:17
details 38:15
  54:6
determination
  43:17 45:8
determine 43:20
determined 12:6
developed 61:14
difference 31:9
  31:18
differences 15:2
  15:3 24:19
different 6:6
  12:14,19,22
  14:19
differently 42:20
  42:21
direction 10:20
  11:2 64:10
directly 10:16
  12:4,23 13:7,14
  13:15,24 14:8
  15:15 20:23
  24:18 33:3
  53:21
discrepancy

33:14
discriminate
  34:17
discuss 25:23
  58:17
discussed 26:15
discussion
  43:13 59:16
discussions
  26:12 38:4,7
  52:5
distance 41:23
distinction 13:5
  25:9 26:5 32:22
  57:17,20
distinguish
  13:24
district 1:1,2
  21:13,20 22:14
  22:15 23:2,2
  24:1,2
DIVISION 1:3
doctor 36:15
doctors 39:15
doctor's 39:15
documents
  35:19 42:10,10
  42:12 56:18,21
  56:23 57:5
dollar 43:7
door 44:24
Downsville 5:17
draft 28:16
drafts 28:14
Drawer 2:8
dried 46:24
drug 39:22 46:8
  46:23 47:5,8,10
dry 61:24
duly 5:1 64:7
duty 6:14 36:12
  36:19 39:14
  54:5

**E**

E 2:3

earlier 42:24
  60:13 61:25
earning 37:19
easily 16:2
Eason 21:17
educational 7:14
effective 4:8,11
eight 50:1
either 10:10,10
  10:11 34:5 60:3
  60:4
elected 16:9 55:8
electrical 7:15
  7:16 23:5
electricians 31:7
employ 64:14
employer 5:19
  29:4
employment
  4:13 30:24,25
  31:1 32:8,23
  45:4,18
end-of-the-year
  48:14
engaged 37:9
engineer 7:15
engineering 7:16
enter 29:10 59:1
entered 29:18
  48:3
entity 5:24,25
  58:24
environment
  34:6
equipment 51:15
essentially 57:23
et 43:16,16
evaluating 46:8
evaluations 25:3
everybody 44:24
exact 6:8 52:10
Exactly 17:20
Examination 4:1
  4:2,2,3 5:2
  57:11 61:19
exchanged

28:14
excuse 22:4
execute 28:10
executed 28:13
  61:6,14
EXHIBITS 4:5
existed 8:8
exists 59:19
experience 7:8
  7:11,13 12:25
  13:7,10,16
  32:10 58:20
experiences
  31:15
expertise 60:17
explained 13:20
explore 57:15
extra 11:23

**F**

facility 19:17
fact 24:17 37:14
  39:21 53:4
factor 23:18 40:3
factors 23:21
  24:11
facts 10:1 30:15
factual 61:15
fair 58:15
fairly 15:16 46:24
far 7:12 11:24
  16:17 30:2
  43:15 46:23
  48:20
fault 40:4
fax 18:12 20:21
  35:14
feasible 37:5
Federal 3:4
feel 40:4 55:14
feet 42:1
felt 53:2
field 14:19
file 52:7,24 56:22
  56:25
filed 5:6 28:3

39:23
filing 36:24
  52:15 64:18
fill 16:18 17:14
  17:24 26:1,3
  36:2 44:19,24
  45:5,11,17,18
  46:1,3
filled 42:21 44:4
filling 17:10,11
fills 18:21 20:4
financial 47:15
  47:20,22 57:18
find 23:23 31:6
  31:14
fine 24:16
finger 54:3
fire 15:22 16:8
  16:11
first 6:12 11:7
  21:3,10 23:12
  24:8,9 42:6
  45:14
five 31:4
fixed 28:18
floor 27:24 37:20
folder 56:12,13
  56:14
folks 10:19 12:3
  12:14 13:22
  14:8 15:5,15
  20:9 24:18 25:3
  32:7 33:20 49:5
follows 5:1
follow-up 35:23
foregoing 64:5
  64:11
forms 17:9 44:22
forth 61:16
found 33:2
four 31:4 33:24
  43:5 55:20
frame 20:12
free 19:11
front 28:5
FRP 15:22 51:5

full 10:17 11:8
  39:14
full-time 11:19
  12:20 13:21
  15:6 26:16,25
  32:21 49:9,20
  50:5,8 60:9,15
functions 7:12
furnace 34:6
further 61:18,19
  62:13,14 64:16
future 40:11

**G**

gain 45:4
gainfully 37:8
Gary 48:24,25
  54:18,18,21
  55:1
generated 17:9
Gina 9:18,22
give 5:7 20:12
  37:13 39:22
  43:6,10,17,20
  44:4,13,14,15
given 5:8 15:25
  29:25 34:25
  36:19
gives 34:21
goes 48:10 56:10
good 13:23
  25:19,19,21
Graduated 7:20
Graphics 29:6
  58:22
Graphic's 40:16
gray 46:20,21
great 22:17
  23:16
greater 33:11
ground 41:1,2,5
  41:15,21
group 62:2
groups 48:15
guess 7:25 9:2
  13:22 19:5

31:17 50:9
52:14 53:3 54:5

**H**

**H** 42:7
**Hales** 2:7
**hand** 41:25 54:3
64:20
**handed** 28:4
**handle** 48:9
**handled** 24:17
**hands-on** 7:13
**handy** 44:22
**happen** 8:5 37:9
46:19
**happened** 38:9
38:11,12 41:8
46:13,18 59:23
**happening** 41:14
**happens** 37:11
**happy** 5:14 56:5
56:20
**health** 27:2,5
**hear** 20:19,22
**heard** 53:10
**heavy** 39:14
**help** 37:15 50:6
**helpers** 49:6
**hereinabove**
64:6
**hey** 22:17 25:20
31:3
**high** 13:2 35:3
**higher** 42:18
**Highway** 5:16
**hired** 7:2 13:1
46:21 60:15
**hires** 46:9
**hiring** 9:12 23:8
31:22 32:16
**history** 56:4
**home** 5:16 37:12
54:21 55:1
**Honestly** 21:6
36:14
**HORNSBY** 1:10

**hospital** 38:14
**hot** 34:5,9,18
35:7
**hour** 19:2 23:25
24:12 37:18
42:25 43:3,7
44:7 56:9 62:7
62:11
**hours** 14:13
17:18 43:15
50:1,15,17
53:12 54:21
62:4
**Howard** 1:14 3:2
4:6,7,10,12,14
4:15 5:1,4,16
57:13 60:7
62:15 64:6
**Howard-1** 42:7
**hundred** 42:1
**hurt** 53:1
**hypothetical**
34:4,13,22 35:9
**H-2** 42:10,16,24
**H-3** 42:10,24
**H-4** 44:15,16
60:24,25
**H-5** 60:25 61:4

**I**

**idea** 19:23 28:1
39:1,13 53:7
**identified** 61:5
**identify** 25:21
**iffy** 46:16
**immediate** 21:16
21:17
**implies** 30:14
59:9
**improve** 25:22
**included** 56:14
**income** 50:9
**Incorporated**
28:24
**increase** 25:24
42:19,22,25

43:3,4,7,11
57:5
**Inc's** 29:6
**INDEX** 4:1,5
**individual** 13:9
13:10 31:20
32:2
**individuals**
10:24 11:1 14:1
**informal** 25:22
**information**
27:15 35:18
45:12 56:24
61:9,11,13
**informed** 29:2,8
**initial** 6:13 18:22
28:16
**injured** 36:22
**injuries** 54:9,15
**injury** 36:10 54:3
54:3
**insofar** 26:20
**inspectors** 49:9
49:9
**instance** 17:6
25:17 27:8
58:20
**instruction**
29:25
**insurance** 27:2,5
**interested** 64:15
**internal** 24:12
**International**
1:10 2:11 3:3
6:23 7:1,1,21
64:18
**INTERVENOR**
2:16
**interview** 23:4
23:24 32:14
45:21
**investigation** 4:6
36:1 42:7
**involved** 39:21
**IP** 7:23
**issued** 5:6 35:17

**J**

**JAMES** 1:8
**Jim** 21:17
**jobs** 14:1,10 15:8
16:23 17:23
34:3,11 35:5
50:5 56:12
**John** 9:5
**Johnson** 2:18
**Jonathan** 1:7 2:2
29:4 47:17 60:8
60:15
**Jr** 2:7,12 64:17
**JUDGE** 1:8,10

**K**

**Karen** 33:19
55:22 56:1
**keep** 13:21 36:25
37:7,8 44:22
56:8,24 57:6
**Kellogg** 7:3,3
**Ken** 48:21,22
**kind** 12:2 17:21
25:22 31:6,16
34:5 38:12 46:7
46:16 48:9
51:14 59:4
**knew** 35:7
**knowing** 7:11
**knowledge**
14:11 27:12,13
27:15 33:22
47:19 48:13
52:19 53:18
59:6 60:17
61:11,12
**known** 6:1 53:19
**knows** 22:18

**L**

**LA** 2:5,9,14,20
**label** 42:6 44:15
**labor** 30:24,24
30:25 31:1,19
32:8,23 57:19

57:25 58:3,25
**laborer** 19:11
**LaPlace** 8:21
**law** 1:17 2:8
28:11
**laws** 64:3
**lawsuit** 5:6 52:7
52:15,24
**let's** 15:3 20:13
25:5 35:13
**level** 12:25,25
13:2,6,7,9,10
13:16,16 35:3
60:17
**levels** 49:5
**light** 36:12 37:16
54:5
**light-bulb** 37:20
**light-duty** 36:16
55:4
**limited** 56:24
**line** 57:15
**lines** 17:22
**listen** 25:20
**listening** 45:13
**little** 7:10 57:21
**LLP** 2:13
**load** 17:6 41:10
61:23 62:5
**Lofton** 48:21,22
**long** 6:24 21:8
24:15 43:2,15
55:16
**longer** 49:1
55:19
**long-sleeved**
15:23
**look** 14:13 34:19
44:14
**looking** 27:22
31:7 32:13
52:15,23 59:8
**looks** 42:20
44:18
**loose** 58:14
**lot** 15:7,8,14

20:22 23:22
  50:11 51:1 57:1
**lots** 22:21
**Louisiana** 1:2,17
  2:16 5:17,22
  7:18 8:18 29:7
  62:17 64:3
**love** 22:18,19
**lucky** 46:25

**M**

**MAGISTRATE**
  1:10
**main** 35:1
**maintenance**
  6:22 7:2,6,10
  10:6 12:3 37:20
  49:2
**making** 37:9
  41:5 51:6 61:3
**man** 37:10 41:4
  54:17
**Manpower** 32:13
**March** 61:6
**mark** 61:4
**markup** 19:20
  21:22 55:5
**matter** 26:7
  52:16
**Mayer** 2:13
**mechanical** 17:6
  41:10
**mechanics** 31:7
**meet** 9:6
**meeting** 25:5
  40:15
**men** 16:5
**merely** 47:15
**merit** 30:15
**messy** 55:11
**met** 5:4
**mill** 7:2
**mind** 23:18
  60:17
**miserable** 34:9
  34:16

**mistake** 28:16
**miswording**
  28:17
**modify** 61:15
**monetarily** 53:3
**monetary** 52:21
**money** 52:17,24
**monitored** 24:24
**Monroe** 1:3,17
  2:5 5:22 8:21
  10:8,9 19:17
  21:12 22:7
  48:22
**months** 6:25
  7:24 24:9 33:8
  39:6 55:18,20
**moonlighting**
  14:16,20,22
**morning** 59:7
**move** 32:20
**moved** 41:11
**multiple** 17:23
**Musa** 2:18
**Myrt** 2:7

**N**

**name** 5:5,15,16
  8:2 54:18,19
  59:8,9
**named** 54:18
**names** 11:7,8
**nasty** 34:16
**nature** 21:1 27:5
  28:15 33:15
  42:19 48:15
**necessarily**
  34:16
**need** 5:13 16:5
  20:15 22:21
  31:4,19,21 33:8
  37:3,15 51:14
  55:9,13 60:24
  62:25
**needed** 13:22
  14:4 34:20
  43:16 50:11

55:14
**needs** 16:5
**negotiate** 23:25
**negotiated** 19:22
  32:5
**negotiates** 58:22
**never** 33:12
  46:24,25 51:22
  56:7
**new** 42:14,16,18
  44:19
**new-hire** 44:18
**Nielsen's** 12:12
  15:7 18:7 29:14
  29:21 36:17
  40:2 49:14,20
  50:8 56:4,13
**nine** 10:10,10,11
  10:17 11:9,14
**normal** 40:14
**normally** 36:21
**North** 5:17
**notice** 50:12,13
**Noticed** 2:15
**no-competition**
  14:17
**number** 1:7 21:7
  60:23
**numerous** 48:4

**O**

**oaths** 64:4
**Object** 16:10
  27:11 29:22
  30:13 34:12
  40:12 48:12
  62:8
**objection** 16:13
  27:14,19 30:17
  34:14 35:9
  61:25
**obligated** 62:6
**obligation** 48:6,8
**obligations**
  48:14
**observations**

38:2
**obviously** 19:11
**occasion** 5:9,10
**occurred** 38:22
**offer** 37:1,2
**offhand** 11:7,8
  52:4 53:25
**office** 18:2,6
  21:12,17 22:8
  28:9,11,12
  31:14 44:22
**offices** 1:17 8:12
  8:18
**official** 64:20
**Off-the-record**
  62:20
**Ogg** 1:17 2:4
**okay** 13:12,13
  34:23 46:12
  56:3 63:4
**once** 18:12,12
  19:13 63:3
**operating** 40:15
**operation** 6:17
**operator** 41:22
  41:24
**opposed** 12:15
  23:15 58:2
**opposite** 57:23
  58:3
**ordinarily** 57:24
**original** 64:16
**Ouachita** 29:7
**outcome** 64:15
**outside** 59:21
**outsourced** 7:6
**overflow** 12:2
  49:22,25,25
**oversee** 16:4
  49:12
**overseeing** 6:18

**P**

**P** 1:23 64:2,23
**package** 18:23
**Packaging** 1:10

2:11 3:3 5:5
  27:7,8,16,17
  29:3,6 64:18
**packet** 42:13
  46:2
**page** 4:6,9,11
  44:13 60:25
**pages** 4:13,15
  44:13,15
**paid** 14:7 15:12
  17:2 33:25 52:2
  52:3 53:15 62:6
  62:9
**pants** 15:23
**Paper** 6:23 7:1,1
  7:22
**papers** 20:6
  45:12
**paperwork** 16:18
  18:22,23 20:4
  26:1 42:13
**paragraph** 30:23
  47:14
**paragraphs**
  61:10
**Parish** 29:7
**part** 29:12,19
  30:2 42:13 44:2
  61:3,22 62:2
**participating**
  43:6
**particular** 10:7
  15:25 16:23
  34:24 40:21
  60:8
**parties** 64:14
**partner** 31:3
**parts** 7:11
**party** 27:7
**pass** 57:8
**paying** 37:18
  44:9 47:24
  53:12 54:21
**payrolled** 23:10
  23:11 25:13
  26:17

payroller 59:14
  59:18,19 60:16
payrollers 25:9
pays 19:14 48:1
  48:7
percent 19:15
  44:9 48:1,7,18
  55:5 62:7,9
perception 44:3
performance
  25:2
performed 29:5
  29:12,19 30:10
  60:4
performing
  40:17 61:22
  62:3
period 9:10
  23:13
periods 23:18
person 23:14
  45:22 46:1 58:2
  58:2,13,24
personal 20:9
  64:10
Personnel 4:8,8
  4:10,10,13
persons 22:11
  47:17
pertaining 56:21
phone 39:1
  52:12
physical 39:12
physically 40:1
pick 33:8
piece 51:15
pieces 7:11
place 29:6 34:15
  34:18 64:6
placed 60:18
plaintiff 2:2
  57:13
please 5:11,15
plus 19:15
point 23:6 25:23
  31:16 45:7,22

52:14
policies 40:10
policy 14:16,17
  14:20,22 46:22
pool 30:24,25
  31:1,19 32:8,23
  57:19 58:4,25
poor 34:22
popped 46:12
portion 58:23
position 5:21
  14:3 32:21
  60:19
possibly 22:15
potential 46:9
practical 26:7
practice 25:14
  25:15,15,25
preclude 5:14
precluded 14:9
present 2:15
  47:1
pretty 6:5
prevent 41:14
previously 35:17
  47:13
pricing 22:2
primary 11:17
  50:9
principal 58:21
printout 56:2
Pro 5:24 6:1,2,12
  7:25 8:4,6
probably 13:3
  34:22 37:4
  39:10 55:20
  57:1
probationary
  23:13,17
problem 34:21
problems 46:18
procedure 3:4
  40:15
procedures
  40:10
proceed 23:8

process 19:13
  23:4 26:2 45:6
  45:21
processes 25:12
produced 42:11
  56:1,19
prohibit 50:7
project 60:4,5
propounded
  64:9
provide 31:8
  47:8 50:24,24
  51:6,13,17
  59:13
provided 15:10
  15:12,17 19:9
  27:4 50:20
  51:22
provider 30:24
  30:24,25 31:1
  32:23 57:18,25
  58:4
providers 32:8
  57:19
provides 47:15
  47:20 59:10
providing 25:18
Pro/Konecranes
  6:21
purchased 51:3
pure 44:1
purely 34:13
purpose 9:13
purposes 3:4
  45:4 61:3
put 5:5 22:22
  36:12 42:7 45:1
  45:9,10,16,16
  50:13 54:22
  55:3 56:12
pyramid 21:14
p.m 1:17 35:15
  35:15 63:5
P.O 2:4,8,19

Q

qualified 23:4
question 5:13
  16:10 20:20,24
  21:1 25:8 27:11
  29:22 30:13
  34:12 40:12
  48:12 62:8
questioning
  57:16
questions 5:11
  57:9 61:13
  62:13 64:9
quick 35:13
quite 11:18
quote/unquote
  16:17 46:20

R

rafters 41:9
Rahman 2:18,18
raise 43:11,18,20
  43:24 44:4
raw 13:5
Rayville 2:9
reached 60:17
read 62:16,18
reading 3:5
  62:18
real 35:2
reason 11:14,17
  62:25
reasons 60:14
rebranding 8:10
received 28:2
  35:20 52:12
  53:8 54:16,17
  54:17
receiving 53:5
  53:11
reciprocal 48:8
recognize 28:6
  35:20
recollection 38:7
record 17:18
  22:1 35:15
  60:21 61:4

records 56:8
recruit 31:17
recruited 32:4
  33:1
recruiting 31:22
  58:7,7
recruits 57:25
referred 61:1
refuse 35:6
regarding 21:1
regional 21:13
reimburse 53:13
reject 46:5
related 64:13
relates 57:17
relationship 21:2
  21:10 57:22,24
  58:19
release 39:15
released 39:14
reliable 22:18
remember 10:11
  36:14,14 43:6
  43:12 51:2
  52:10 53:25,25
  54:6 59:17
renew 7:4
repeat 5:12
rephrase 13:8
report 4:6 35:23
  42:7 64:4
reported 1:23
  64:9
reporter 62:16
  64:2
REPORTER'S
  64:1
representing 5:5
request 9:9
requirement
  43:22 51:5
requirements
  47:4
resistant 15:22
respect 32:24
  33:24

responsibilities 6:6
responsive 5:13
rest 13:4 15:10 44:14 46:2 51:8
result 40:10 52:7 62:4
results 47:8,10
retain 20:6
return 36:13,15 39:14
returned 36:8
Return-to-work 36:12
revert 47:3
review 18:9 25:12,15,23 26:2 28:20 63:1
reviews 25:3
role 6:14 9:12 16:22,25 39:24
Root 7:3
Root's 7:3
Rouge 2:20
routed 32:6
routine 58:18
Royal 1:17
Rules 3:4
run 22:11 33:3
running 6:20 35:4
runway 40:21,24 41:11,19

**S**

S 2:19
safekeeping 64:19
safely 17:5
safety 40:16,16
salary 12:5
sales 6:19 49:10
salesman 48:22
salespeople 49:11
saw 27:24

saying 27:20 36:15
says 15:19 28:23 29:2 36:5 44:25
say-so 19:1
scheme 22:2
scope 27:12
screen 46:8 47:5 47:10
screens 47:8
seal 64:20
second 5:9,10 47:14 60:25
secretary 33:7,8
secrets 14:12
see 8:9 15:19 16:4 33:23 34:2 36:5 37:6 39:8 39:20 56:5,19 62:25
seeing 27:22 36:14
seen 56:7
selected 33:1
send 16:6 19:14 31:24 32:14 33:8 34:9 41:25 42:14 44:9 46:3 47:12 48:16,18 63:2
sending 58:2
sends 58:1
sense 31:17
sent 17:2 44:5
sentence 47:14
separate 18:7 47:5
September 29:7 29:14
set 12:12,13 18:20,22,23,24 21:14 32:17 34:20 59:1 61:16
sets 31:7,16
shirt 15:19,23

shop 36:19,24 37:6 38:24 54:23 55:4,12
short 50:12,13
shortly 39:3
show 35:19 42:5 42:9,9 44:12 56:6,20
showed 57:4,4
shows 24:14
Shreveport 2:14
shut 41:10
side 6:19
sign 14:18 62:16 62:18
signature 36:3,5 61:7,7
signed 28:3,15 28:21 36:6
signing 3:5 62:19
simply 30:15 58:13
sir 5:15
sister-in-law 9:20
sit 25:4,20 39:19 54:25
site 53:1
sites 37:10,11 56:11
sitting 37:12
situation 31:9,10
situations 49:22
sizable 50:13
skill 12:25 13:2,6 13:9,16 31:6,16 34:19 59:1
skills 31:21 59:13 60:18
Smith 2:13
solely 22:16
soliciting 31:20 60:3
somebody 11:23 15:14 16:11

34:9
sorry 11:8 54:5
sort 36:19
sound 20:1 36:20
sounds 37:2
source 50:9
speak 41:9 49:5
speaking 12:8
specialty 51:16
specific 15:7 40:2 52:21
specifically 22:13 43:12 56:10,16 57:17
spent 62:5
spotter 41:1,2,21
spreadsheet 17:22
staff 13:21
standard 25:14 25:25
start 6:2,4 9:7 13:10
started 5:25 6:5 6:12,14 19:25 38:3 43:5
state 29:10 47:14 64:3,3
stated 59:18 61:25 64:7
statement 29:15 29:17 40:7 47:18,19 58:15
statements 61:15
STATES 1:1
stations 41:15
status 42:18
Stiltner 2:18
STIPULATIONS 3:1
stop 41:15,21
straight 22:1 45:8
stuff 48:9 57:4

subcontract 59:2
subcontracting 58:19
subcontractor 29:5 30:15
subject 16:13 27:14 30:17 34:14
subpoena 5:7 35:17
subsidiary 8:7
suit 28:3
summary 13:23
superior 37:24
superiors 37:25
supervise 49:6
supervised 24:22
supervision 7:6 7:9,10 64:11
supervisor 18:3 21:16,17
supervisors 6:18 16:3 20:23 28:20 35:2 49:7 49:10
supervisor's 4:6 35:23 36:5 42:6
support 11:24 14:5
suppose 16:14 35:11
sure 24:11,12 27:20 29:24 38:24,24 40:22 41:5 47:1 51:4
sustainable 11:24
sweat 34:8
sweeping 37:20
sworn 5:1 64:7

**T**

T 2:7
take 5:13 18:10 18:16 21:12

Brad Howard

22:7 34:9 35:3
35:13 48:8
**taken** 1:17 3:2
64:6
**talk** 15:3 20:13
22:14 23:2,3,24
24:2 38:10
39:19
**talked** 26:17
38:23,25,25
39:7,10 52:14
**talking** 8:16
30:23 38:15
47:13 49:19
54:11 57:16
60:22
**tax** 48:9
**Tech** 7:18
**technical** 7:13
62:23
**technician** 49:3
49:4
**technicians** 6:18
10:5 49:7,8,13
50:17 51:12
**telephone** 20:8
**tell** 14:13 16:15
16:15 17:5 26:8
31:6,15,19
32:13 34:17
35:12 52:11
**telling** 26:7
31:21 37:24
45:14 55:3
**temp** 32:20
**temporary** 30:24
33:6 57:19,24
58:3,25 59:1
**temp-to-hire**
32:19
**ten** 10:10,10,11
10:12,17 11:9
11:15
**termination**
16:17
**terms** 7:5 12:17

12:18 62:23
**test** 23:5
**testified** 5:1 49:2
49:24
**testify** 64:7
**testimony** 64:9
**Thank** 62:14
**Thanks** 61:18
**thicker** 56:22
**thing** 8:10 12:2
17:22 18:5
32:18,19
**things** 16:20
17:1 23:5,13
27:3 31:23 37:9
39:20 40:11
43:14 46:2,23
47:4 50:10
56:17
**think** 8:17 11:7
28:17 33:18
44:5 47:10
49:20 50:20
53:18 54:2,18
56:20
**thinking** 50:1
59:7
**third** 27:7 58:24
58:24
**thought** 23:16
**thousands** 8:16
**three** 11:5,10,15
16:5 24:8 33:24
40:21,25 55:20
**Thruway** 2:19
**ticket** 20:20
56:13
**tickets** 56:12,14
**times** 20:22
32:10 39:8 48:4
**timesheet** 18:4,7
**timesheets** 17:1
17:8,8,9,10,11
17:14,24,25
18:10,11,15
**title** 6:6,7 21:19

49:3
**titles** 49:7
**today** 5:7 28:11
56:18 60:13
61:13
**told** 19:24 24:24
33:11 38:8
50:20 52:13,16
54:20 55:1,9
**Toms** 1:23 64:2
64:23
**tool** 51:16
**tools** 51:9,12,22
**top** 44:13
**totally** 34:2
**track** 17:23
**trade** 14:12
**traditional** 58:18
**training** 58:10
**transcribed**
64:10
**transcript** 62:22
64:11,12,17
**treat** 26:8
**treatment** 15:2
24:19
**trolley** 40:23
**true** 47:19 59:9
60:7 61:10,21
64:11
**truth** 64:8,8,8
**try** 34:19,19
37:12,24 40:11
**trying** 30:1 45:4
51:2 54:6
**turn** 18:2 47:25
**two** 8:19 11:6
13:12 16:6
26:18 33:7 34:3
42:10,12 43:10
48:15 49:21
**type** 6:14 8:10
12:2 17:22 25:2
25:22 32:11,19
42:14 48:3
51:16 52:15

54:23 58:18
**typed** 28:8,9
62:24
**typical** 15:11
50:3

**U**
**Uh-huh** 8:10,15
8:24 9:25 10:18
20:7 21:23
22:20 30:9
33:16 36:11
44:11
**understand** 5:11
8:22 12:8 23:17
27:20 29:24
58:18
**understanding**
8:6,25 18:16
33:17 34:1
41:12 53:11
57:22 60:2,12
64:13
**understood** 5:12
5:23 39:24 41:8
**uniform** 15:17,20
50:21,24,25
**uniforms** 15:4,5
15:6,10,13,21
51:3
**unilateral** 44:2
**UNITED** 1:1
**use** 13:19,22,24
41:18 46:23
50:1,3,4 51:9
51:12 55:2

**V**
**vacations** 26:20
**various** 10:6
**versa** 23:20
**versus** 1:8 12:20
15:5
**vice** 23:20
**vicinity** 41:16

**W**

**wage** 13:17
31:23 32:4 57:5
**waive** 62:18,21
**waived** 3:5
**walked** 27:24
**walks** 44:24
**wanted** 15:24
23:16 35:25
44:7 54:22
**wants** 23:25
59:19
**warehouse** 35:7
35:8
**wasn't** 36:10
55:18
**watching** 41:5
**way** 16:19 24:22
24:24,25 27:8
30:14 42:1
52:25 64:15
**ways** 25:21
**wear** 15:5,5
**week** 11:22
14:13 50:1,15
50:18 52:2
53:12 54:21
**weekend** 14:4,6
50:6
**weekends** 14:14
**weekly** 17:3
**weigh** 23:21
**went** 7:21,23
23:4 36:18
38:11,11 57:19
**WESTERN** 1:2
**we'll** 5:14 25:5
42:7 45:7 46:1
46:3
**we're** 8:16 24:4,6
24:7 28:11
31:20,20 32:1
32:13 40:17,25
41:7 45:7,8,10
**we've** 26:17
33:13 38:2 47:1
**whatsoever** 60:3

| | | | |
|---|---|---|---|
| **WillStaff** 32:12 32:18 | **X** 31:5 | **151** 5:17 **1550** 2:13 | **44** 4:12 |
| **Wilson** 48:24,25 | **Y** | **17th** 61:6 | **5** |
| **Winn-Dixie** 14:14 | **year** 6:9 39:10 55:19 | **180-degree** 34:6 **1904** 1:17 | **5** 4:2,14 **50-ton** 61:24 |
| **wish** 47:16 60:8 60:14 | **years** 5:4 15:9 39:18 43:5,10 | **2** | **57** 4:2 |
| **wishes** 58:23 | **y'all** 18:8 | **2** 4:7,13,15 **2-25-08** 4:9 | **6** |
| **withholdings** 48:9 | **Z** | **2/29** 43:4 **2:40** 63:5 | **6-17-05** 4:11 **61** 4:3,14 |
| **witness** 3:5 57:8 62:25 63:4 64:7 64:20 | **ZIP** 5:17 **$** | **20** 13:21 **20th** 64:20 **2004** 19:24,25 | **61-1** 28:3 61:1,2 **7** |
| **witnesses** 64:5 | **$1-an-hour** 42:22 43:20,23 | **2006** 6:3 21:22 **2008** 29:15 | **70898-8001** 2:20 **71101** 2:14 |
| **witness's** 27:12 | **$1-per-hour** 43:4 43:17 | **2009** 54:1,2 **2010** 35:17 | **71207-4600** 2:5 **71234** 5:18 |
| **word** 15:3 | **$17** 37:18 62:7 | **2011** 1:17 61:6 | **71269-0149** 2:9 |
| **worked** 7:24 13:7 17:18,19 22:24 36:9 39:18 48:25 56:9 | 62:11 **$20,000** 51:14 **$30** 44:7 | 64:21 **222-6420** 2:14 **2237** 2:19 **23rd** 29:7,15 | **728-4413** 2:9 **9** **9/23/08** 36:9 |
| **worker** 19:2 22:17 54:9 | **#** | **2433** 5:16 **25** 19:15 44:9 | **9/24/08** 36:12,13 **90** 23:12 |
| **workers** 2:17 24:20 32:9,24 39:23 47:24 53:5,9,14,20,22 | **#88032** 1:23 64:23 **0** | 48:1 55:5 **25-percent** 19:20 21:22 | **98001** 2:19 |
| **worker's** 52:6 | **04** 7:20,23 43:5 | **3** | |
| **workload** 11:17 11:18,24 13:20 | **06** 9:3,4 10:4 11:3 | **3** 4:10 **3:09-cv-01757** | |
| **workman's** 54:4 54:7 | **08** 29:7 43:4 | 1:7 **30** 24:9 | |
| **works** 15:12 56:11 | **1** | **318** 2:5,9,14 **325-3200** 2:5 | |
| **world** 8:13,14 | **1** 4:6,6,9,11 **1st** 6:3 | **4** | |
| **worried** 62:22 | **1:00** 1:17 | **4** 4:12 47:14 56:2 | |
| **wouldn't** 16:16 16:16 17:5 20:15,23 31:18 32:16 34:16 39:24 40:3 52:24 55:6 | **1:48** 35:15 **1:55** 35:15 **10,000** 8:17 **10-28-03** 4:13 **12** 1:17 49:15,16 49:19,20 | **40** 14:13 50:15 50:17 53:12 54:21 **40-hour-a-wee...** 11:20 | |
| **would've** 53:19 | **125** 48:6,18 62:6 62:9 | **401(k)** 27:2 | |
| **wrong** 25:6 26:9 | **13** 13:21 **14600** 2:4 | **401(k)s** 27:5 **42** 4:6,7,10 | |
| **X** | **149** 2:8 | | |