UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| JONATHAN NIELSEN | : | NUMBER: 3:09-cv-01757 |
| VERSUS | : | JUDGE JAMES |
| GRAPHIC PACKAGING INTERNATIONAL, INC. | : | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.  Introduction..................................................................................1

II. Prior Rulings............................................................................2

III. Mr. Nielsen is Konecranes' Statutory Employee............................................4

IV. Mr. Nielsen is Konecranes' employee under the borrowed servant doctrine............10

V. Konecranes' selection, engagement, payment of wages (through Clayton), power to discharge and right to control Mr. Nielsen makes Mr. Nielsen an employee of Konecranes..............................................................11

VI. Conclusion..............................................................................21

CERTIFICATE..............................................................................24

## TABLE OF AUTHORITIES

### STATE CASES

*O'Regan v. Preferred Enterprises, Inc.*, 758 So.2d 124 (La. 2000)................................2

*Dugan v. Waste Management, Inc.*, 41 So.3d 1263 (La. App. 2nd Cir. 2010) ....................4

*Steinfelds v. Villarubia*, 53 So.3d 1275 (La. App. 4th Cir. 2010).................................11

*Hillman v. Comm-Care, Inc.*, 2001-1140, p. 6, (La. 1/15/02),
    805 So.2d 1157, 1161.........................................................................11

*Tate v. Progressive Sec. Ins. Co.*, 2008-0950, p. 8, (La. App. 4 Cir.
    1/28/09), 4 So.3d 915, 920..................................................................12

*Book v. Police Jury of Concordia*, 59 So.2d 151, 156 (La. App. 2nd Cir. 1952)...............21

*Sicard v. City of New Orleans*, 184 So.2d 21 (La. 1966).........................................21

*Mouton v. Blue Martin Tools*, 799 So.2d 1215 (La. App. 3rd Cir. 2001).......................21

## STATE STATUTES

La. R.S. 23:1061(A)(3)........................................................................1

La. R.S. 23:1031(C)...........................................................................2

La. R.S. 23:1061.........................................................................10, 11

La. R.S. 23:1031.........................................................................10, 11

La. R.S. 23:1032(A)(1)(a)....................................................................11

## LOUISIANA CIVIL CODE ARTICLES

La. C.C. art. 1846............................................................................3

## TREATISE

W. Malone & A. Johnson, *Workers Compensation Law and Practice,*
    § 363, in 14 Louisiana Civil Law Treatise (5th ed. 2010)...............................2

**MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**MAY IT PLEASE THE COURT:**

**I.    Introduction**

In this Court's Initial Ruling (Doc. 41) on GPI's Motion for Summary Judgment (Doc. 24) and plaintiff's Cross-Motion for Partial Summary Judgment (Doc. 30) this Court held that the contract between GPI and Konecranes contained the required statutory language to make GPI the statutory employer of Konecranes' employees and statutory employees. This initial element of GPI's statutory employment defense was established through the Affidavit of Jeff Touzat and the attached purchase order which contained the required language under La. R.S. 23:1061(A)(3), which Affidavit and attachments were previously filed herein as Doc. 24-3 and are adopted herein by reference. There is no dispute that GPI is the statutory employer of Konecranes' employees and statutory employees.

The only remaining issue is whether Mr. Nielsen is an employee or statutory employee of Konecranes. GPI asserts three separate and distinct reasons why Mr. Nielsen is an employee or statutory employee of Konecranes and there are no disputes over the relevant facts which mandate the legal conclusions that Mr. Nielsen is an employee and/or statutory employee of Konecranes. GPI asserts that Mr. Nielsen should be considered an employee of Konecranes because he was recruited, hired, supervised and completely controlled by Konecranes in the performance of the details of his work. GPI also asserts that, as a borrowed servant of Konecranes, Mr. Nielsen is considered an employee of Konecranes for

1

all purposes under the workers' compensation act even though no claim has been asserted against Konecranes for compensation benefits.  GPI also asserts that under the two contract theory Mr. Nielsen is the statutory employee of Konecranes.   Under all three of these scenarios GPI is exposed to pay workers' compensation benefits to Mr. Nielsen and once this inescapable conclusion is reached GPI is entitled to tort immunity.  In *O'Regan v. Preferred Enterprises, Inc.*, 758 So.2d 124 (La. 2000) the Louisiana Supreme Court stated:

> All states are unanimous in that the compensation remedy is exclusive of all other remedies by the employee *if* the injury falls within the coverage formula of the workers' compensation act [emphasis in original]

> 758 So.2d at 135.

The same rules for determining who is an employee for evaluating compensation exposure are also applied to determine tort immunity.

> Since it is firmly settled that compensation is the exclusive remedy between the employee and the employer, it is important to know precisely who is an employee.  Obviously, the same principles which decided this question when the issue was whether compensation was payable should also be used to decide the question of whether a tort remedy must be denied on the same basis.   W. Malone & A. Johnson, *Workers Compensation Law and Practice* § 363, in 14 Louisiana Civil Law Treatise (5[th] ed. 2010)

## II.    Prior Rulings

In its initial ruling (Doc. 41) this Court held that the "borrowed servant" doctrine cannot result in a finding that Konecranes is the "employer" of Mr. Nielsen because La. R.S. 23:1031(C) provides that "where compensation is claimed from or proceedings are taken

2

against the special employer, then, in the application of this chapter, reference to the special employer shall be substituted for reference to the employer" and since no compensation is claimed from Konecranes, Konecranes cannot be Mr. Nielsen's employer under the borrowed servant doctrine. While GPI disagreed with this Court's prior holding that a claim must actually be asserted by Mr. Nielsen against Konecranes in order for Konecranes to be deemed an employer for all purposes, this holding was not challenged by GPI as part of its Motion for Reconsideration (Doc. 43). Without waiving its right to subsequently reassert the position that, as a borrowing employer, Konecranes is deemed to be Mr. Nielsen's employer for all purposes, GPI asserted in its Motion for Reconsideration that the Court had erred in denying GPI's alternative basis for finding statutory employment, i.e. the two contract theory. In its initial ruling this Court held that GPI had failed to sufficiently prove the existence of an oral contract under La. C.C. art. 1846 between Konecranes and Clayton, and therefore GPI could not avail itself of the two contract theory to establish Mr. Nielsen was a statutory employee of Konecranes. On its Motion for Reconsideration GPI asserted that the existence of this oral contract was an undisputed fact and therefore no further proof if its existence was required. In partially granting GPI's Motion for Reconsideration this Court held that there was a genuine issue of material fact as to whether or not an oral contract existed between Konecranes and Clayton (Doc. 47). Therefore this Court affirmed its denial of GPI's Motion for Summary Judgment but reversed its granting of plaintiff's Cross-Motion for Partial Summary Judgment to strike GPI's statutory employment defense. The existence

3

of a genuine issue of material fact as to whether or not an oral existed left the door open for
GPI to prove Mr. Nielsen was Konecranes' statutory employee under the two contract theory.

**III.    Mr. Nielsen is Konecranes' Statutory Employee**

Plaintiff has now filed another Motion for Summary Partial Judgment (Doc. 51)
attaching the Affidavit of Karen Derocher (Doc. 51-1) and a Supplemental Memorandum in
Support of Plaintiff's Motion for Partial Summary Judgment (Doc. 61) attaching the
Affidavit of Brad Howard (Doc. 61-1) in an effort to establish that there was no contract
between Konecranes and Clayton whereby Clayton became a subcontractor to Konecranes in
connection with any services provided by Konecranes.  However GPI does not contend the
object of the oral contract between Clayton and Konecranes was for Clayton to perform part
of Konecranes' work.  The object of this contract was for Clayton to pay certain individuals,
including Mr. Nielsen, to perform work for Konecranes.  The lawful cause or consideration
for this contract was that in exchange for Clayton handling the payroll for Mr. Nielsen and
other Konecranes' workers, Konecranes would reimburse Clayton for 125% of its payments
to Konecranes' workers.  Konecranes and Clayton both consented to this arrangement that
has been an ongoing practice between Clayton and Konecranes for many years.

There is nothing in the statute or jurisprudence that requires that the contract between
Clayton and Konecranes be entered into in furtherance of Konecranes' contract with GPI.
*Dugan v. Waste Management, Inc.*, 41 So.3d 1263 (La. App. 2nd Cir. 2010).  In *Dugan,
supra*, the plaintiff's employer, CPST, was a labor pool provider that merely provided
workers to Waste Management and had no knowledge whose contract Waste Management

4

was using its workers to fulfill, just like Clayton had no knowledge that Konecranes was using Mr. Nielsen to fulfill Konecranes' contract with GPI. In rejecting the exact argument that Mr. Nielsen is now making the court stated:

> Contrary to plaintiffs' argument, there is nothing in the statute or jurisprudence that requires that the contract between Waste Management, Inc. and CPST expressly provide that it was entered into "in furtherance of" the contract with the Police Jury. Therefore, we find that Waste Management, LLC met its burden of proving that it was a statutory employer in this case, and is therefore protected by the "two contract" statutory employer defense.

41 So.3d at 1267-1268

The requisite undisputed facts are now before the court to establish an oral contractual relationship between Konecranes and Clayton as there are now two witnesses (Brad Howard and Karen Durocher) to establish this oral contract that required Konecranes to pay Clayton 125% of the amount Clayton paid to Mr. Nielsen and other Konecrane workers. In his deposition Mr. Brad Howard, the branch manager for Konecranes' Monroe office, stated:

> Q      What role did Clayton Administrative Services have in the particular day-to-day jobs that Mr. Nielsen would do for Konecranes?
>
> A      The only role that Clayton Administrative had was, you know, the daily timesheets and things like that would be approved by us and sent to them so that he could be paid, you know, on a biweekly basis or weekly basis, however they pay their people.
>
> Q      They wouldn't tell him how to safely change out a mechanical load brake for instance?

5

A       No.

Q       These timesheets, where did these timesheets – who generated the forms for these timesheets?

A       The guys are filling out our timesheets, and it's –

Q       The Clayton guys are filling out Konecranes timesheets?

A       Yes.

Q       And what about your direct employees? Do they have to fill out timesheets, too?

A       Yes.

Q       And they are the same form?

A       Yes.

Q       And what – does it just record the hours they worked and where they worked?

A       Exactly. It's just, you know, time in and out, which job they were on, you know, and it's kind of like a spreadsheet type thing where they've got several lines there to track multiple jobs.

Q       And the Konecranes employees that fill the timesheets out, what would they do with their timesheets at the end of the day?

A       They bring them into our office and turn them in to their supervisor.

Q       What would Mr. Nielsen do with his timesheet?

A       The same thing.

6

Q      And what would your office do – I mean would you separate out Mr. Nielsen's timesheet from your direct employees, or how would y'all work that?

A      Yes. You know, we would go through, review all the timesheets and approve them, and then we would take the timesheets that would go to Clayton for the Clayton employees and we would fax those over to them, once they – once we approved them.

Q      And do you know what Clayton would do with those timesheets?

A      No, I don't. I mean my understanding is, they take the time and they pay their guys.

Q      Well, how did they know what hourly rate to pay Mr. Nielsen?

A      At the time that the employee is set up, if you will, to – you know, like if they guy comes in, he fills out all his initial paperwork to be set up with Clayton, the hourly rate is set in that package paperwork.

Q      And that's an hourly rate that you set?

A      Yes.

Q      And so Clayton doesn't have any say-so about what their guy is going to work for by the hour; you and the worker agree on that hourly rate?

A      That's right.

Q      And then so you, I guess, assume that that's the hourly rate that Clayton would then pay Mr. Nielsen?

A      Yes.

Q      Based on the time that you have approved for the work that you have provided for him to do?

7

A    Yes.

Q    So obviously you didn't get a free laborer that day. Did you get a bill back from Clayton?

A    Yes. Clayton – you know, once all this process, Clayton pays the guys and all that, they send us a bill for that hourly rate plus 25 percent.

Q    And has that been the arrangement ever since you became the branch manager or service manager at the Monroe facility for Konecranes?

A    Yes. Yes, it has.

Q    It's always been a 25-percent markup?

A    Yes.

[Depo. Brad Howard, P. 16, L. 22 – P. 19, L. 21]

Q    In your affidavit we were previously talking about, you state in Paragraph 4, the second sentence: "Clayton Administrative Services merely provides a financial service to clients such as Konecranes when they do not wish to claim persons, such as Jonathan Nielsen, as their employees." Is that a statement you made?

A    Yeah. To my knowledge, that's a true statement.

Q    What is the financial service that Clayton provides to clients such as Konecranes?

A    The financial service is basically, you know, taking care of their payroll, you know, cutting their pay check, paying their workers' comp.

Q    And what Konecranes would then in turn do for Clayton is pay 25 percent more of what Clayton pays to the employee?

8

A    That's right.

Q    And you entered into that type of an agreement on numerous times as a manager for Konecranes, Inc.?

A    Yes.

Q    Other than the obligation of Konecranes to pay 125 percent of what Clayton pays the employees, and the reciprocal obligation of Clayton to take care of the payroll and any tax withholdings and handle all that kind of stuff that goes along with payroll, what other agreements are there between Clayton and Konecranes, Inc.?

MR. CRAWFORD:    Object to the form of the question.

A    None to my knowledge.

Q    There is no end-of-the-year accounting obligations or anything of that nature between the two groups? Just you send the time in and they cut the check to the employee, do all the payroll associated with cutting that check, and then send a bill for 125 percent of what the employee got from Clayton? That's it?

A    As far as I know, that is correct.

[Depo. Brad Howard, P. 47, L. 13 – P. 48, L. 20]

The undisputed facts clearly show the existence of an oral contract between Clayton and

Konecranes for Clayton to pay Konecranes' workers and Konecranes to pay Clayton 125%

of Clayton's payments to Konecranes' workers.    Because it is an undisputed fact that

Konecranes was using Mr. Nielsen to perform part of Konecranes' contractual obligation to

GPI (Depo. of Brad Howard, P. 30, L. 4-12 and P. 61, L. 21 – P. 62, L. 12)  Mr. Nielsen was Konecranes' statutory employee under the two contract theory.

## IV.    Mr. Nielsen is Konecranes' employee under the borrowed servant doctrine.

GPI also contends that this Court should now reconsider its earlier holding that because no compensation is claimed from Konecranes, Konecranes should not be considered the employer of Mr. Nielsen for all purposes under the workers' compensation act.  While every single factor to establish a borrowed servant relationship between Mr. Nielsen and Konecranes exists as was demonstrated in GPI's original motion for summary judgment (Doc. 24) this Court seemed to hold in its initial Ruling (Doc. 41) that this relationship would not make Konecranes' Mr. Nielsen's employer for purposes of tort immunity under La. R.S. 23:1061 even though La. R.S. 23:1031 commands that once a borrowed servant relationship is found "in the application of this Chapter [the entire Louisiana Workers Compensation Act] reference to the special employer shall be substituted for reference to the employer".  Tort immunity is not dependent upon the actual payment of workers' compensation benefits or even the assertion of a claim for workers' compensation benefits.  Tort immunity under the workers' compensation act is based merely upon the exposure to pay workers' compensation.

> It is one of the anomalies of Louisiana compensation law that an entire group of persons or entities who may never actually pay compensation to a claimant, or even be asked to do so, nonetheless enjoy complete immunity from suit in tort by such a claimant.    W. Malone Johnson & A. Johnson *Workers Compensation Law and Practice* § 364 in 14 Louisiana Civil Law Treatise (5th ed 2010)\

10

La. R.S. 23:1032(A)(1)(a) provides in pertinent part that "the **rights** and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this chapter, shall be exclusive of all other rights, remedies and claims for damages". It is not the assertion of a claim that compensation benefits are owed that results in tort immunity but it is the rights granted to a worker to receive compensation benefits that creates tort immunity. Because Mr. Nielsen is Konecranes' borrowed employee under La. R.S. 23:1031 and therefore has the right to recover compensation from Konecranes, Konecranes "shall" be considered his employer for all purposes under the entire workers compensation act, which includes La. R.S. 23:1061.

**V.      Konecranes' selection, engagement, payment of wages (through Clayton), power to discharge and right to control Mr. Nielsen makes Mr. Nielsen an employee of Konecranes.**

The recent deposition of Brad Howard has established another basis for finding that Mr. Nielsen is an employee of Konecranes. In *Steinfelds v. Villarubia*, 53 So.3d 1275 (La. App. 4th Cir. 2010) the Court stated:

> Ordinarily, an employee's exclusive remedy against his employer for an on-the-job injury is workers' compensation La. R.S. 23:1032. La. R.S. 23:1044 provides that "[a] person rendering service for another in any trades, businesses or occupations covered by this Chapter is presumed to be an employee under this Chapter," thereby creating a statutory presumption of employment status. *Hillman v. Comm-Care, Inc.*, 2001-1140, p. 6, (La. 1/15/02), 805 So.2d 1157, 1161.
>
> The presumption contained in La. R.S. 23:1044 is based upon the employer/employee relationship, "the essence of [which] is the right to control." *Hillman*, 2001-1140, p. 8, 805 So.2d at 1162. The four primary factors evidencing the right to control

11

> are: 1) selection and engagement; 2) payment of wages; 3) power of dismissal; and 4) power of control. *Id*. None of these factors alone is determinative of an employer/employee relationship. Rather, the totality of circumstances must be considered. *Tate v. Progressive Sec. Ins. Co.*, 2008-0950, p. 8 (La. App. 4 Cir. 1/28/09), 4 So.3d 915, 920.
>
> 53 So.3d 1279-1280

It is now established that Konecranes had the exclusive and unfettered right to control Mr.

Nielsen and did so. Mr. Howard testified:

> Q    When you came to work at Konecranes, Inc. in May of '06, how many service technicians did Konecranes have doing its maintenance for various companies?
>
> MR. CRAWFORD:  At this particular branch?
>
> MR. ROBERTS:  Yeah, at the Monroe branch, working out of the Monroe branch.
>
> A    It was either nine or ten. Either nine or ten. I can't remember which it was, but it was either nine or ten. It may have been ten.
>
> Q    And these guys that were doing this work, were they all employed by Clayton Administrative Services, Inc., or would some be employed by Clayton and some be employed by Konecranes directly?
>
> A    Now, the nine or ten people that we had were all full employees of Konecranes. Uh-huh.
>
> Q    And so did you have additional folks that could do crane service work at the direction of Konecranes that were not Konecranes employees?
>
> A    Yes.

Q       And you would consider Mr. Nielsen to be one of those individuals?

A       Yes.

Q       How many individuals did you have that could do work on cranes at Konecranes' direction that were not direct employees of Konecranes when you came in there in May of '06?

A       At that time it was – at that time I believe it was three people, Mr. Nielsen being one of those.

Q       Do you know who the other two were?

A       Not offhand.   I can think of first names but I don't know their full names offhand.   I'm sorry, Colly.

Q       So there were about nine or ten direct Konecranes employees and then there were about three guys that were not direct   employees   but   were   employed   by   Clayton Administrative Services, Inc.?

A       Correct.

[Depo. Brad Howard, P. 10, L. 4 – P. 11, L. 13]

Q       And the folks that were doing maintenance work on cranes that were directly employed by Konecranes, Inc., did they work on a salary, or did they get an hourly rate, or how was their pay determined?

A       It was an hourly rate.

Q       And I understand from speaking with Mr. Nielsen and Clayton that Mr. Nielsen also had an hourly rate.   Is that correct?

A       Yes.

Q       Do you know who would set Mr. Nielsen's hourly rate?

13

A     It would be set by me.

[Depo. Brad Howard, P. 12, L. 3-13]

Q     Did you have any uniforms that employees at Konecranes would wear versus uniforms that Clayton folks would not wear?

A     Our full-time employees all have uniforms, yes. You know, in Mr. Nielsen's specific case, you know, he did a lot of – you know, he was on a lot of jobs for Konecranes. Basically Mr. Nielsen, I believe, you know, some years ago was provided with uniforms just like the rest of our employees.

[Depo. Brad Howard, P. 15, L. 4-11]

Q     Was Mr. Nielsen somebody that did a lot more work than most folks that are directly employed by Clayton?

A     Yeah. We used Mr. Nielsen fairly consistently, yes.

Q     And so you provided him with a uniform?

A     Yes.

[Depo. Brad Howard, P. 15, L. 14 – 18]

Q     Who made the decision about whether or not you wanted Mr. Nielsen to do a particular job on any given day? Who would make that call?

A     It could very easily be myself. Also our service supervisors could make that call if they – you know, they more or less oversee the day-to-day. If they see we have a need and, you know, if the job needs three men and we only have two, you know, guys that we can send out there, then they might make that decision.

Q     Would someone at Konecranes have the right to fire Mr. Nielsen if they elected to do so?

14

MR. CRAWFORD: Object to the form of the question. I don't know how you can fire somebody that's not your employee.

Go ahead subject to my objection.

A    Basically we could – I suppose we could. I mean we could tell – we could basically tell Mr. Nielsen we have no work for him, but it wouldn't be a – you know, it wouldn't be a quote/unquote termination as far as – you know, there would be no paperwork on my end I'd have to fill out.

Q    Right. But you could say "I don't like the way you're doing things, don't come back"?

A    Right. That's right.

Q    What role did Clayton Administrative Services have in the particular day-to day jobs that Mr. Nielsen would do for Konecranes?

A    The only role that Clayton Administrative had was, you know, the daily timesheets and things like that would be approved by us and sent to them so that he could be paid, you know, on a biweekly basis or weekly basis, however they pay their people.

[Depo. Brad Howard, P. 15, L. 24 – P. 17, L. 4]

Q    And other than the fact that payroll is handled through Clayton for those folks that are employed directly by Clayton, are there any other differences in your treatment of the workers that work on cranes?

A    No.

Q    They are supervised in the same way?

A    Yes.

15

Q        They are monitored in the same way and told what to do, what not to do in the same way?

A        Yes.

[Depo. Brad Howard, P. 24, L. 17 – 23]

Q        So basically the distinction you make between an employment labor pool provider and Clayton Administrative Services is that with respect to the workers that are employed by Clayton Administrative Services, you've actually gone out and selected those people, recruited those people, found those people, as if they were going to come to work directly for you, but you just run their payroll through Clayton Administrative Services?

A        That is correct.

[Depo. Brad Howard, P. 32, L. 22 – P. 33, L. 5]

Q        Who decides which particular job Mr. Nielsen is going to do on a given day?

A        The main day-to-day decisions are made by our service supervisors. It might even be made by myself if it's a real high level but, you know, I've got those guys that take care of running the day-to-day and I let them, you know, do their jobs.

Q        Would Mr. Nielsen have the right to refuse the job in the hot warehouse when he knew that he would rather be doing the job in the cool warehouse?

        MR.    CRAWFORD:        Same    objection    to    the hypothetical. Go ahead.

A        I suppose Mr. Nielsen may not like it, but he is going to go where we tell him to go.

[Depo. Brad Howard, P. 34, L. 24 – P. 35, L. 12]

Q       Do you remember participating in that decision to give him a dollar an hour increase?

A       Yes.

Q       And how did that – is that just something, he had been there two years or whatever and you decided to give him an increase, or how does that – did he ask for a raise or what?

A       I don't remember if he specifically asked. I know there was a discussion that we had with him about, you know, his capabilities and the things that he had done for us and, you know, going above and beyond as far as working long hours if we needed him to, et cetera, et cetera. And, you know, we made the determination then we would give him a $1-per-hour raise.

Q       Did you consult with Clayton Administrative Services to determine if they would agree to give him a $1-an-hour raise?

A       No.

Q       Are you aware of any requirement that Clayton Administrative Services has to agree to that $1-an-hour raise?

A       No.

Q       Do you know that they don't have to, it's a pure unilateral decision on Konecranes' part?

A       Basically my perception was, you know, if we decided to give one of these employees a raise, you know, we filled out this form and sent it to Clayton. And I don't think they really cared.

Q       If you wanted to pay him $30 an hour, you could do it?

A       That's right.

17

Q     You just end up paying 25 percent more when they send the bill back to you for the –

A     Yeah. Uh-huh.

[Depo. Brad Howard, P. 43, L. 6 – P. 44, L. 11]

Q     And does everybody that walks in the door fill out a form that says Clayton Administrative Services and then you decided whether to put them on as a direct employee of Konecranes later, or how does that work?

A     No.   Basically, someone that's coming in for the purposes of trying to gain employment with us, we would have them fill out one of our company applications, you know, basically go through the process. If it's someone we choose that we're going to hire, at that point we'll make a determination if we're going to bring them straight onto Konecranes' payroll or put them on Clayton Administrative's payroll. If the decision is made that we're going to put them on Clayton's payroll, then we have them fill out Clayton's information. They are these papers.

Q     I may not have been listening to your answer.   So you're telling me that you first decide whether or not you're going to hire them, and then you decide whether or not you're going to put them on with Clayton or put them on with Konecranes, and then you have them fill out the correct application?

A     No. The candidates fill out a Konecranes employment application.

Q     All right.

A     We go through the interview process. If we hire the person, at that point we decide if he's going to be a Konecranes employee through our payroll or if he's going to be, you know, an employee through Clayton's payroll. If it's decided that he's going to be through Clayton's payroll, then we'll have the person fill out Clayton's application along with, you know, the

18

rest of the packet of things that they have to fill out for Clayton, and then we'll send that in to them.

Q    Have you ever had Clayton reject one of your employees?

A.    No.

[Depo. Brad Howard, P. 44, L. 24 – P. 46, L. 6]

Q    Do you know if Clayton conducts a separate drug screen on employees?

A    I don't know.

Q    Do you provide the results of your drug screens to Clayton?

A    I don't believe we do. I think the drug screen results just go to our own company people. I don't believe we also send that to Clayton, no.

[Depo. Brad Howard, P. 47, L. 5-12]

Q    Mr. Nielsen testified that he was a maintenance technician. Would that be what his title was?

A    Service technician.

Q    And what are the levels, so to speak, of folks that you supervise? I mean do you have helpers or do you have service technicians, service supervisors? What are the job titles?

A    Well, I mean basically we have service technicians. We also have full-time inspectors, crane inspectors, and then we have service supervisors. We have contract sales and service salespeople. We have a branch administrator. You know, those are all the people that I oversee.

Q    How many service technicians did you have at the time of Mr. Nielsen's accident?

19

A     I believe I had – I want to say at that time I had 12.

Q     And of those 12 how many were Clayton employees and how many were –

A     Well, I didn't count the Clayton employees in that. I was talking about I had 12 Konecranes people. At the time of Mr. Nielsen's accident, I think I had – I had 12 full-time Konecranes employees, and then I had maybe two guys like Mr. Neilsen that I called for, you know, any overflow situations through Clayton.

[Depo. Brad Howard, P. 49, L. 2-23]

Mr. Howard has testified that Konecranes recruited, hired and completely supervised the details of Mr. Nielsen's work just like the service technicians Konecranes paid directly. Konecranes set Mr. Nielsen's hourly rate and unilaterally gave pay raises without any input whatsoever from Clayton. Konecranes even provided Mr. Nielsen with a Konecranes uniform to wear just like Konecranes' direct employees. While Mr. Howard and Ms. Karen Derocher of Clayton have both testified that Clayton was not a "labor pool provider" or "temporary employment agency" as they understand the term, their reasons for this assertion are that Mr. Nielsen was recruited, hired and controlled exclusively (including his rate of pay) by Konecranes. After Konecranes made the initial decision to hire Mr. Nielsen Konecranes subsequently decided to have Mr. Nielsen's payroll run through Clayton. The hourly rate was negotiated solely between Konecranes and Mr. Nielsen and this hourly rate is dictated by Konecranes to Clayton. Konecranes cannot escape its status as Mr. Nielsen's

20

employer merely because Konecranes made the unilateral decision to run Mr. Nielsen's payroll through Clayton.

In order to establish an employer/employee relationship it is not essential that the wages of the employee be paid by the employer. *Book v. Police Jury of Concordia*, 59 So.2d 151, 156 (La. App. 2nd Cir. 1952), *Sicard v. City of New Orleans*, 184 So.2d 21 (La. 1966). In *Mouton v. Blue Martin Tools*, 799 So.2d 1215 (La. App. 3rd Cir. 2001) the plaintiff unsuccessfully argued that he should be allowed to sue Blue Martin in tort because he was actually an employee of Select Staffing which the court described as an "employee payroll service". Nevertheless the trial court held that Blue Martin was the plaintiff's employer and refused to find a genuine issue of material fact urged by plaintiff due to his assertion that he was actually employed by Select Staffing and the court of appeal affirmed the ruling.

The undisputed facts mandate a finding that Mr. Nielsen was an employee of Konecranes.

## VI.  Conclusion

Based on GPI's prior Motion for Summary Judgment this Court has correctly held that GPI is the statutory employer of Konecranes' employees and statutory employees. The evidence upon which this prior holding was made and the legal arguments and statutory and jurisprudential law to support this holding have previously been submitted to the Court and are adopted by reference. This motion now satisfies the Court's need for additional evidence to support the existence of the oral contract between Konecranes and Clayton which this Court previously felt was lacking to support a finding that Konecranes is Mr. Nielsen's

21

statutory employer under the two contract theory of statutory employment. It is undisputed that Konecranes recruited, hired, supervised and controlled Mr. Nielsen as if Mr. Nielsen was its own direct employee and that in exchange for Clayton handling Mr. Nielsen's payroll checks Konecranes paid Clayton 125% of the amount Clayton paid to Mr. Nielsen. This was a routine practice between Clayton and Konecranes and while its terms were not reduced to a written document there can be no doubt that there was a binding agreement between Clayton and Konecranes and the terms of this agreement cannot be disputed. Mr. Brad Howard's deposition testimony further confirms the existence of this oral contract and he has unequivocally stated that Mr. Nielsen was performing part of Konecranes' contractual obligation to GPI when the accident occurred thus satisfying the requirements of the two contract theory of statutory employment.

This Court has previously ruled that in order for the borrowed servant doctrine to result in a legal finding that Konecranes is Mr. Nielsen's employer a claim must actually be asserted against Konecranes. This holding is at odds with the fundamental principal that if a defendant is exposed to pay workers' compensation benefits then this mere exposure creates tort immunity, even though the injured worker never attempts to recover workers' compensation benefits from the borrowing employer.

Finally Mr. Howard's testimony establishes that despite the imposition of an intermediary (Clayton) between Konecranes and Mr. Nielsen, Mr. Nielsen should be considered an employee of Konecranes. The law does not require that a worker be paid directly by a business for an employer/employee relationship to be established. Mr. Nielsen

22

was recruited, hired and supervised just like Konecranes' direct employees and he was even provided with a Konecranes' uniform. An employment relationship and the resulting workers' compensation exposure cannot be avoided simply by contracting with an intermediary to handle the payroll. All factors courts have traditionally evaluated to determine whether or not an employment relationship exists are clearly met and therefore Mr. Nielsen should be considered an employee of Konecranes. Since GPI is the statutory employer of Konecranes' employees and statutory employees, GPI is entitled to tort immunity from Mr. Nielsen.

Respectfully submitted,

MAYER, SMITH & ROBERTS, L.L.P.
Attorneys for Graphic Packaging International, Inc.

By: _s/Caldwell Roberts, Jr._
       Caldwell Roberts, Jr., Bar No. 20343
       1550 Creswell
       Shreveport, Louisiana 71101
       Telephone: (318) 222-2135
       Facsimile: (318) 222-6420

## **CERTIFICATE**

I HEREBY CERTIFY that on April 29, 2011 a copy of the Memorandum in Support of Motion for Summary Judgment was electronically filed with the Clerk of Court by using the CM/ECF system which will send a notice to electronic filing to all counsel of record.

_s/Caldwell Roberts, Jr._

OF COUNSEL
